(No. 72708.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. TERRANCE TOWNS, Appellant.

*Opinion filed September 23, 1993.—Rehearing
denied November 29, 1993.*

94

Charles M. Schiedel, Deputy Defender, of Springfield, and Charles Hoffman, Assistant Appellate Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn Kaplan, Solicitor General, and Terence M. Madsen and Penelope Gainer, Assistant Attorneys General, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

Defendant, Terrance Towns, was convicted in the circuit court of St. Clair County of first degree murder. At sentencing the jury determined that defendant was eligible for the death penalty based on the fact that the murder occurred during the course of an armed robbery. Finding factors in aggravation, the jury returned a verdict of death. Defendant's execution was stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rules 603, 609(a).

On appeal defendant argues that: (1) he was denied his right to have a fair and impartial jury; (2) the State failed to lay a proper foundation for a note found in defendant's brother's bedroom, and thus, the trial court erred in admitting the note; (3) defense counsel was ineffective by failing to exclude all references to defendant's prior incarceration which were contained in defendant's pretrial statement; (4) the jury received improper instructions; (5) the jury actually voted for a nondeath verdict, but this verdict was not reported to the court by the foreperson; (6) the sentence of death is excessive in this case; and (7) the Illinois death penalty statute is unconstitutional.

## FACTS

On the morning of February 22, 1990, the body of Charles Woodcock, Jr., was found on the floor in the rear of the Short Stop convenience store in Fairview Heights, Illinois. Woodcock worked in the store alone between 5 p.m. and closing at 11 p.m. The cash register tape revealed that the last sale on the night of February 21 was made at 10:58 p.m. and the cash register drawer was opened at 11:14 p.m. Woodcock's car was found on fire at 12:40 a.m. on February 22, and the car stereo had been removed. When Woodcock's body was discovered, it was also determined that $2,000 was missing from the store, but that $153 remained in the cash register and $1,000 was in the open safe. An autopsy revealed that Woodcock sustained two gunshot wounds to the head, one of which was fatal.

During the police investigation, it was discovered that defendant had been acquainted with Woodcock prior to his death, and that defendant had been seen on several occasions in the Short Stop convenience store shortly before closing, talking to Woodcock. Defendant lived only about 1,000 feet from the convenience store.

On the evening of February 23, 1990, defendant made a statement to the police regarding the shooting of Woodcock and the convenience store robbery. Defendant told the police that he had been in the store at closing time on February 21 while Woodcock was counting the cash register receipts. While counting the receipts, Woodcock momentarily went to the rear of the store and left some money on the counter. While Woodcock was in the rear, defendant took some of the money. Upon Woodcock's return, he noticed the missing money and accused the defendant of taking it and stated that he was going to call the police. Defendant responded by shooting Woodcock twice and taking the money from the counter and money which was contained in a bank bag. Defendant drove away in Woodcock's car, removed the stereo, and set the car on fire.

In addition to making the above oral statement, defendant also signed a written statement in which defendant admitted that the robbery of the convenience store had been planned for approximately two weeks. The plan was for defendant to enter the store about five minutes before closing without being seen, get whoever was working away from the cash register, take the money from the register and drive away. The plan included the use of a gun only if Woodcock was working since Woodcock knew the defendant. Defendant told the police that he had "speeched" the plan to his brother who wrote it down.

The police searched the home in which defendant, his mother, and his brother, Reyondos Taylor, lived. In Taylor's bedroom, the police found a handwritten note between the mattress and the box spring. The note read as follows:

"Wednesday's Plan. Get Wardell or somebody to go in around 10:45 with me. And when he go to the back, Wardell shoot him. And we clean things out, money, ticket,

medium pampers. Wardell might want some beer, a get away. Take his keys, pull his car up to the door, put him in. Clean blood up and lock door and come to City. I'll take stereo, EQ, speakers, Then leave him and his keys in car on dark street with no fingerprints. And it's over."

A gun, which belonged to defendant's mother and which was kept in her bedroom, was determined to have fired the bullets that killed Woodcock. Additionally, the stereo equipment which had been taken from Woodcock's car was found in the home of defendant's sister. She lived approximately five blocks from where Woodcock's car was found.

Arianna McKinney, defendant's girlfriend, testified at trial that on the evening of February 21, 1990, she was watching television with the defendant at his home. At about 9 p.m. McKinney and the defendant drove to the Short Stop convenience store, bought some candy and returned home. McKinney fell asleep and when she awoke it was approximately 11 p.m. The defendant was gone at this time, and McKinney was told by some friends that they had driven the defendant to the Short Stop convenience store and that he was going to walk back home. McKinney drove to the Short Stop convenience store and saw both defendant and his brother inside the store trying to hide. She blew her car horn and both defendant and his brother came out of the store. McKinney was told to leave, and she then drove back home.

Defendant testified on his own behalf. He admitted that he had known Woodcock and considered him a friend with whom he shared a common interest in stereos. On February 21, 1990, defendant testified that he had visited his sister's home in East St. Louis and that he had carried his mother's gun for protection from gang members who had previously beaten and harassed him. He left his sister's home around 5:30 p.m. and re-

turned to his home. During the evening he watched television with his girlfriend, Arianna McKinney, and they both went to the Short Stop to buy some potato chips and candy. Woodcock was working in the store and he told the defendant to return later that evening to discuss a stereo convention that was going to take place. Around 10:30 p.m. defendant returned to the Short Stop. While in the store, Woodcock went to the rear of the store and turned off some lights. When Woodcock returned, he claimed that some money which had been on the counter was missing. Defendant stated that he did not take the money and offered to allow Woodcock to search him. After defendant made his offer to be searched, he realized that he was still carrying his mother's gun which he had taken with him to East St. Louis. Woodcock picked up the phone and stated that he was going to call the police. Defendant pulled out the gun, and as he cocked the hammer, his hand slipped and the gun accidentally fired. Defendant claimed that in response to the gun firing, he "shook" and "jerked the gun back," but that it fired again accidentally a second time. Afraid to call the police, defendant took some money from the store and drove off in Woodcock's car which was subsequently abandoned and set on fire.

Defendant also testified that he told the police that the shooting was accidental, but that he must have been misunderstood since this fact was not contained in the written statement which he signed. Defendant claimed that he did not read the statement before he signed it, but rather merely skimmed it and signed where indicated. Defendant also claimed that he did not tell the police that the robbery had been planned for a couple of weeks and that this portion of the written statement was also inaccurate. Finally, defendant stated that he had never seen the "Wednesday plan" note which was found

in his brother's bedroom, and that he had not taken any stereo equipment from Woodcock's car.

The State rebutted defendant's testimony with the three police officers who took defendant's statements. All three of the officers denied that defendant told them that the shooting was accidental. In defendant's statement, he said: "I shot him [Woodcock] twice. The first time I popped him, he grabbed his head. He turned his head and then I shot him again on the other side of the head."

The jury found defendant guilty of first degree murder and eligible for the death penalty on the basis that the murder occurred during the course of an armed robbery. Evidence in aggravation and mitigation was presented to the jury, and a verdict of death was subsequently returned.

## DISCUSSION

### I. Claims Relating to the Right to a Fair and Impartial Jury

Although the jurors were administered a juror's oath prior to the commencement of opening statement and the presentation of evidence, no oath was administered prior to their *voir dire* questioning. Defendant contends that the Jury Act requires prospective jurors to be sworn in *prior* to *voir dire*, and that since the trial court did not administer such an oath prior to the questioning he was denied his constitutional and statutory right to a fair and impartial jury. Out of the jurors who were ultimately selected to sit on the case four of them stated that they had previously read or heard about the case but that they could still be fair and impartial. Defendant argues that this assertion by the four jurors is insufficient to guarantee a fair trial since they were not under oath at the time the statements were made. In

order to preserve an issue for appeal, it must both be objected to at the time of the alleged error and set out with specificity in a prompt post-trial motion. Although defendant raised his issue in his final amended post-trial motion, he failed to raise it during *voir dire* itself. Thus, the issue has been waived. Regardless, however, of defendant's waiver, defendant's claim lacks merit.

The Jury Act, in addressing challenges to prospective jurors, provides:

> "It shall not be a cause of challenge that a juror has read in the newspapers an account of the commission of the crime with which the prisoner is charged, if such juror shall state on oath that he believes he can render an impartial verdict according to the law and the evidence. In the trial of any criminal cause, the fact that a person called as a juror has formed an opinion or impression, based upon rumor or upon newspaper statements (about the truth of which he has expressed no opinion,) shall not disqualify him to serve as a juror in such case, if he shall upon oath state that he believes he can fairly and impartially render a verdict therein, in accordance with the law and the evidence and the court shall be satisfied of the truth of such statement." (Ill. Rev. Stat. 1991, ch. 78, par. 14.)

Contrary to defendant's assertion, this oath does not have to be given prior to *voir dire* questioning of all prospective jurors. While the decision to accept a potential juror as an impartial trier of fact is discretionary with the trial judge, the trial judge is obliged to insure that the defendant receives a trial before a fair and impartial jury. (*People v. Taylor* (1984), 101 Ill. 2d 377, 386-87.) Additionally, however, it is the responsibility of each party to challenge venire members whom they wish to have removed from the pool of potential jurors. The challenges can be either for cause, or by way of peremptory challenges. Once it becomes apparent that a venire member has been exposed to pretrial publicity,

both sides have the opportunity to require the venire member to take an oath stating that he or she can fairly and impartially render a verdict. However, there is no requirement that a blanket oath be given in all situations without even a request.

There is no simple test to determine juror impartiality in every case. It is necessary for each potential juror to be questioned to determine whether he has preconceived beliefs regarding a defendant's guilt. While the oath contained in section 14 of the Jury Act would aid in making this determination, the trial court is not obligated to administer this oath without it being requested. Additionally, the defendant has failed to point to any evidence which calls into question the veracity of the answers given by the potential jurors. On the totality of the record in this case, we are satisfied that the trial court conducted a meaningful and thorough *voir dire* and that the jurors who were ultimately selected fairly and impartially rendered a verdict.

In a related argument, defendant claims that he received ineffective assistance of counsel due to counsel's failure to make a timely objection necessary to preserve this issue and by not requiring the oath to be administered. This argument is without merit, because as we have noted, defendant, in this case, received a fair and impartial jury even in the absence of the oath.

Defendant also contends that he was denied a fair and impartial jury since it was not revealed until after trial that one of the jurors, 10 years prior to trial, had attended law school with the prosecutor. During *voir dire* of the prospective jurors, the trial court asked whether any of them knew Lisa Porter, the assistant State's Attorney who was prosecuting the case. Juror Kathleen Moore, a practicing attorney, responded in the affirmative. In questioning Moore, it came out that she knew the prosecutor from her current practice as an at-

torney in a private firm, and also due to the fact that she previously worked as a public defender in the same courthouse as the prosecutor. Additionally, Moore stated that one of her associates had told her that he had a conversation with defendant's family members. She had no idea what had been discussed and told the court that it would not affect her ability to be fair. Defense counsel challenged juror Moore for cause on the grounds that it would be unfair to have an attorney sit as a juror in a capital case, and that because Moore was a friend of the prosecutor. The prosecutor objected, noting that defense counsel's statements lacked merit. The trial court denied the challenge for cause. Having lost his challenge for cause, defense counsel accepted Moore as a juror and elected not to use one of his remaining peremptory challenges. In defendant's post-trial motions, he alleged that he had just become aware of the fact that the prosecuting attorney and juror Moore had both attended Washington University Law School. Attorney Porter responded to defendant's allegations by stating to the trial court that she attended St. Louis University School of Law. After the post-trial motions had been disposed of, attorney Porter told the appellate defender that she had attended law school with juror Moore. Based upon this evidence, defendant claims that he is entitled to have the case remanded to the trial court for an evidentiary hearing.

Where a defendant does not learn of facts which might support a finding of partiality by a juror until after a verdict, a post-trial evidentiary hearing may be necessary. The defendant, however, in seeking an evidentiary hearing bears the burden to introduce and offer specific, detailed and nonconjectural evidence in support of his position. In the absence of such evidence, an evidentiary hearing is not warranted. (*People v. Witte* (1983), 115 Ill. App. 3d 20, 30.) In the instant case,

defendant has offered no proof of juror bias other than the fact that 10 years prior to trial the prosecuting attorney and one of the jurors attended law school together. This evidence, by itself, adds nothing in the way of establishing juror bias. It had already been established during *voir dire* that juror Moore was an attorney, and that she knew the prosecuting attorney. In fact, juror Moore stated that she was previously employed as a public defender and had worked in the same courthouse as the prosecuting attorney. The bare fact that juror Moore and the prosecuting attorney attended the same law school 10 years before lacks significance when viewed with the facts which were established during *voir dire*. There has been no evidence to suggest that this new evidence was intentionally concealed or was even known to juror Moore or attorney Porter at the time of the trial. Thus, we conclude that defendant has failed to offer detailed, nonconjectural evidence supporting a conclusion of juror bias and that the defendant is not entitled to an evidentiary hearing upon this issue.

## II. Alleged Trial Court Error

Defendant claims that the State failed to lay a proper foundation surrounding the handwritten note which was found between the mattress and box spring of defendant's brother's bed, and as such, the trial court erred in allowing its admission into evidence for the purpose of establishing intent. Defendant admits that he "speeched" the plan to rob the Short Stop convenience store to his brother, and that his brother wrote the plan down. However, defendant contends that the State failed to establish that the plan which he "speeched" to his brother was the same plan as that contained in the note. Only if the two plans were one and the same could the contents of the note be attributable to defendant for the purpose of establishing his own intent.

While the State did not ask the defendant if the note accurately reflected what he "speeched" to his brother, authentication can be established by direct and/or circumstantial evidence. (See *People v. Munoz* (1979), 70 Ill. App. 3d 76, 84-85.) In authenticating a document by circumstantial evidence, factors such as appearance, contents, and substance need to be considered. The following circumstantial evidence resulted in a proper foundation being laid for the admission of the note. Defendant admitted that he "speeched" the plan to his brother, and the note was found in defendant's brother's bedroom. The robbery of the convenience store and the murder of Woodcock occurred on Wednesday, February 21, 1990, and the note was entitled "Wednesday's plan." Defendant stated that he told an individual named Wardell about the plan before he "speeched" it to his brother, and Wardell's name is listed in the note as someone who may help commit the robbery and murder. Defendant stated that the plan was to enter the convenience store shortly before it closed at 11 p.m., and the note states that entry into the store should be around 10:45. Defendant admitted to stealing money from the store, and money was listed among the items in the note which were to be taken from the store. Finally, the car stereo was taken from Woodcock's car, and the note states that the stereo is to be taken. Given this volume of evidence corroborating the actual facts surrounding the robbery and murder to the plan set forth in the note, a proper foundation was laid for admission of the note into evidence.

### III. The Elicitation of Statements Regarding Defendant's Prior Incarceration.

Prior to trial, defendant gave a statement to Detective Robert Barth regarding the shooting of Woodcock and the robbery of the convenience store. The following

is a portion of defendant's statement, which was read by Detective Barth while testifying.

"[Detective Barth]: Would you please tell me in your own words what your activities were while at the Short Stop store in Fairview Heights on February 21, 1990, at about 11:15 p.m.?

[Terrance Towns]: I went in the Short Stop store knowing that Charles [Woodcock] was working. I started a conversation with him about motorcycles until the store was closed. And I took $70 from off the counter when Chuck went to the back to turn off the lights. He came back to the cash register and noticed a small portion of money missing. Me knowing that if he called the police I would go back to jail."

At this point, the prosecutor stopped Detective Barth from reading the statement, and after a discussion with the trial judge in chambers, it was determined that the comment made by the defendant referring to the prospect of returning to jail would not be repeated, and no further reference would be made of this comment in front of the jury.

Upon returning to open court, Detective Barth was told to start reading defendant's statement where he had left off.

"[Terrance Towns]: So I asked him to recheck the store to see if he lost it. He said, 'No. I am calling the police.' And I said, 'Chuck, I can't go back to jail.' He said, 'That's your problem.' So I shot him twice. When he fell, I went and grabbed the money on the counter by the cash register. I then went behind the counter and grabbed his jacket. On my way to leave, I noticed that the safe was open. I took one role of dimes and a roll of quarters. I snatched a bank deposit bag and put everything, the money, in the bag and left. I got into Chuck's vehicle, Chuck's Escort, and went to my house."

Defendant now claims that he received ineffective assistance of counsel due to his counsel's failure to move to exclude the two references to defendant's prior incarcer-

ation which were elicited by the prosecutor during the trial.

The defendant's claims of ineffective assistance of counsel must be analyzed in light of *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. Under *Strickland*, the defendant must prove the following in order to establish that defense counsel's performance was constitutionally defective: (1) that "counsel's performance was deficient" in that it "fell below an objective standard of reasonableness"; and (2) that the "deficient performance prejudiced the defense" such that the defendant was deprived of a fair trial whose result was reliable. (*Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) Further, *Strickland* holds that an ineffectiveness claim can often be disposed upon a showing that a defendant suffered no prejudice from the claimed errors without deciding whether the errors constituted constitutionally ineffective assistance of counsel. (*Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.) Additionally, the *Strickland* standard requires "a reasonable probability of a different result, not merely a possibility." *People v. Gacy* (1988), 125 Ill. 2d 117, 129-30.

In support of his argument, defendant refers to numerous cases holding that evidence of unrelated and unconnected criminal conduct is inadmissible. (See *People v. Lampkin* (1983), 98 Ill. 2d 418.) While this general proposition is true, this is not what we have in the case at bar. In this case, two isolated remarks were made: "I would go back to jail," and "Chuck, I can't go back to jail." No evidence was presented as to defendant's specific prior criminal conduct. The remarks were not referred to by either the prosecutor or the defense attorney, nor did the trial judge ever bring these remarks to the attention of the jury. What we have here is not a situation where specifics about a defendant's prior unre-

lated criminal conduct is being used against him in order to obtain a conviction, but rather where out of a lengthy statement, two isolated remarks were made evidencing that defendant had previously been in jail. Additionally, there has been no showing that the prosecutor intentionally elicited these statements from Detective Barth. While it is true that these references to defendant's prior incarceration are apparent from the face of his written statement, the prosecutor interrupted Detective Barth's testimony in an attempt to have these remarks omitted from the defendant's statement. Nevertheless, due to an apparent oversight by the parties and the trial judge, upon resumption of Barth's testimony, the second reference to defendant's prior incarceration was made. Due to the fact that these statements neither were substantively used nor were they ever referred to again, defendant has failed to show that he suffered any prejudice from the two isolated remarks. Thus, his claim of ineffective assistance of counsel must fail.

## IV. Jury Instructions

Defendant claims that he was denied a fair trial due to an error in the jury instructions. Defense counsel offered the following jury instruction which was given by the court.

> "When you retire to the jury room you first will elect one of your members as your foreperson. He or she will preside during your deliberations on your verdict.
>
> Your agreement on a verdict must be unanimous. Your verdict must be in writing and signed by all of you, including your foreperson.
>
> The defendant is charged with the offense of First Degree Murder. Under the law, a person charged with First Degree Murder may be found not guilty, or may be found guilty of First Degree Murder, or guilty of Involuntary Manslaughter.

You are to decide based upon the evidence and the law in this case whether to return a verdict of not guilty, a verdict of guilty of First Degree Murder, or a verdict of guilty of Involuntary Manslaughter.

Accordingly, you will be provided with three verdict forms: 'not guilty', 'guilty of First Degree Murder', and 'guilty of Involuntary Manslaughter.'

From these three verdict forms, you should select the one verdict form that reflects your verdict and sign it as I have stated. Do not write on the other two verdict forms. Sign only one of these verdict forms.

If you find the State has proved the defendant guilty of both First Degree Murder and Involuntary Manslaughter, you should select the verdict form finding the defendant guilty of First Degree Murder and sign it as I have stated. Under these circumstances, do not sign the verdict form finding the defendant guilty of Involuntary Manslaughter."

This instruction is Illinois Pattern Jury Instructions, Criminal, No. 26.01Q (3d ed. 1992) (hereinafter IPI Criminal 3d No. 26.01Q). Defendant now claims that it was error for the trial court to give the last paragraph of this instruction since it is legally impossible for the jury to find him guilty of both first degree murder and involuntary manslaughter. This is due to the fact that first degree murder has the mental state requirement of either intentional or knowing conduct. On the other hand, involuntary manslaughter requires the mental state of recklessness. Thus, it is impossible to fall under both definitions at the same time.

Defense counsel offered to the trial court the instruction now being challenged. Additionally, since no objection was raised as to the tendering of the instruction until defendant's post-trial motion, this error has been waived on appeal. Regardless of defendant's waiver, however, the facts reveal that defendant was not prejudiced by the tendered instruction, and the effect of the

instruction was harmless. In determining the effect of faulty jury instructions on the validity of a defendant's conviction, the instructions should not be judged in artificial isolation but must instead be considered in light of the record as a whole, including the evidence and arguments presented to the jury. *People v. Shields* (1991), 143 Ill. 2d 435, 445-46.

In the present case, the jury received specific instructions addressing the legal elements of murder, armed robbery, and involuntary manslaughter. Specifically, the jury was instructed on these topics as follows:

"To sustain the charge of Murder, the State must prove the following propositions:

FIRST: That the defendant performed the acts which caused the death of Charles Woodcock, Jr.;

SECOND: That when the defendant did so, he intended to kill or do great bodily harm to Charles Woodcock, Jr.;

or

he knew that his acts would cause death to Charles Woodcock, Jr.;

or

he knew that his acts created a great probability of death or great bodily harm to Charles Woodcock, Jr.;

or

he was committing the offense of Armed Robbery.

If you find from your consideration of all of the evidence that each of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these proposition has not been proved beyond a reasonable doubt, you should find the defendant not guilty.

\* \* \*

A person commits the offense of armed robbery when he, while carrying on or about his person, or while otherwise armed with a dangerous weapon, takes prop-

erty from the person or presence of another by the use of force or by threatening the imminent use of force.

* * *

To sustain the charge of involuntary manslaughter, the State must prove the following propositions:

FIRST: That the defendant performed the acts which caused the death of Charles Woodcock. Jr.; and

SECOND: That the defendant performed those acts recklessly; and

THIRD: That those acts were likely to cause the [sic] death or great bodily—to cause death or great bodily harm.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

A rather unique situation exists in the present case. There was substantial evidence, including defendant's own statements, that the defendant shot Woodcock and that defendant took money from the convenience store. However, defendant was charged with neither felony murder nor armed robbery. In defendant's statement to the police, upon being asked: "In what part of the 'Short Stop' store did you shoot Charles Woodcock?" defendant replied, "Charles was behind the front counter and I was standing by the ice bag machine. I shot him twice. The first time I popped him, he grabbed his head. He turned his head and then I shot him again on the other side of the head." Additional evidence presented included the handwritten note detailing the plan to rob the convenience store and the killing of the clerk.

IPI Criminal 3d No. 26.01Q should not be given where a greater and lesser offense is before the jury, and the lesser offense also has a less culpable mental

state. However, due to the unique facts of this case, it is not necessarily true that the lesser offense of involuntary manslaughter has a less culpable mental state requirement than the greater offense of murder. It bears noting at this point that the same jury which found the defendant guilty of murder also found that he was eligible for the death sentence on the basis that the murder occurred during the course of an armed robbery. Given this information, the jury, acting in a logical and legally consistent manner, could have concluded that defendant, while acting recklessly, committed an armed robbery, and shot and killed Charles Woodcock. Thus, since the defendant was not charged with felony murder, the jury would have concluded that the defendant was guilty of both murder, since the death occurred during the course of an armed robbery, and involuntary manslaughter, since the defendant acted recklessly. Thus, due to the unique facts, and the lack of a felony murder charge, in this instance, IPI Criminal 3d No. 26.01Q accurately reflected the law.

A second claim of error rising from the jury instructions also stems from an instruction tendered by defense counsel. Defendant now claims that the involuntary manslaughter instruction set forth above improperly limited the jury's inquiry to the State's evidence regarding whether the defendant acted recklessly, rather than allowing the jury to also consider the defendant's evidence. This argument was fully addressed by this court in *People v. Lucas* (1989), 132 Ill. 2d 399, 439-43, and found to be without merit. We continue to support the *Lucas* decision. Defendant claimed that he accidentally shot Woodcock twice in the head. While the State has the burden of proving a reckless mental state to support a charge of involuntary manslaughter, any evidence regarding the defendant's conduct presented by the defendant in refuting the charges brought against him

would be considered by the jury. Thus, we find no error in the involuntary manslaughter instruction.

## V. Allegations That the Jury Voted for a Nondeath Verdict

Defendant contends that he was denied the right to be tried by a fair and impartial jury because the jury initially did not vote unanimously in favor of the death penalty, and foreperson Moore did not report this vote to the trial court. In support of this argument, defendant relies upon an affidavit by juror Preston Mosley in which he states that foreperson Moore, after a jury vote of 9 to 3 in favor of the death sentence, told the other jurors that after convicting the defendant of first degree murder they were bound to vote for the death penalty. The trial judge considered Mosley's affidavit in ruling on defendant's post-trial motions, and stated that there was nothing in Mosley's affidavit with sufficient merit to justify reviewing the actions of the jury.

In considering the validity of a jury verdict, evidence pertaining to whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror are relevant factors to be considered. (*People v. Holmes* (1978), 69 Ill. 2d 507, 516.) Facts, however, which tend to show the deliberative process of the jury in reaching its verdict cannot be used to impeach the jury verdict. An affidavit by a juror which is made after the jury has given its verdict, has been polled in open court and has been discharged, will not be admitted to impeach a juror's verdict. (*People v. Cabrera* (1987), 116 Ill. 2d 474, 491.) In the present case, there has been no allegation of outside influence upon the jury. The only allegations relate to the deliberative process through which the jury went in reaching its verdict. The jury reached a unani-

mous verdict which was read in open court. After announcing the verdict, defense counsel asked for the jury to be polled. All of the jurors individually responded that the death sentence verdict was, and remained to be, their verdict. In fact, juror Preston Mosley, upon being asked "was this and is this now your verdict," responded by saying "Yes, your Honor." After polling the jury, the trial judge asked defense counsel if he was satisfied with the polling of the jury, and defense counsel stated that he was. The jury was then discharged. Thus, the trial judge properly denied defendant's motion for a hearing in response to Mosley's affidavit. Additionally, even if we were to consider Mosley's affidavit, our review indicates that there is no showing that at the time Mosley was polled he wanted to change his verdict. Thus, consideration of his affidavit would not change our conclusion that the defendant was convicted by a unanimous jury.

## VI. Whether the Death Sentence Is Excessive in This Case

Defendant claims that due to the mitigating factors in this case, the imposition of the death sentence was excessive, and that any sentence other than death should be imposed. Defendant was 19 years old at the time of the murder of Charles Woodcock and he had one prior conviction, which was for the burglary of a motor vehicle. Also in mitigation, defendant relies upon the witnesses, including his mother, grandmother, aunt, and the mother of his girlfriend, who testified at the sentencing hearing that the defendant could be rehabilitated.

In determining whether a death sentence is proper in a particular case, we must consider the character and record of the individual offender and the circumstances of the particular offense. A death sentence is

appropriate if the sentence is commensurate with the seriousness of the offenses and gives adequate consideration to relevant mitigating circumstances. In the instant case, the imposition of the death penalty is supported by the record. Evidence established that the defendant intentionally shot and killed Woodcock during an armed robbery. On February 16, 1990, merely five days prior to the murder of Charles Woodcock, defendant pled guilty to burglary of a motor vehicle, and was placed on probation. In this unrelated offense, defendant attempted to steal a car stereo. A note which was dictated by the defendant detailed the plan to rob the convenience store, kill the clerk, and take his car stereo. The defendant stated that the plan was made about two weeks prior to February 21, 1990, the day on which the plan was carried out. Thus, even prior to pleading guilty to burglary of a motor vehicle, the defendant was already planning the robbery of the convenience store and the murder of Charles Woodcock. Additionally, the record establishes that the defendant established a friendship with Woodcock prior to carrying out his plan. Based upon this evidence, we find substantial support for the imposition of the death sentence, and decline defendant's request for an alternative sentence.

## VII. Constitutionality of the Death Penalty

Defendant contends that the death penalty statute is unconstitutional because it places a burden of proof on the defendant which precludes meaningful consideration of mitigation evidence, and because it does not sufficiently minimize the risk of an arbitrary or a capricious death sentence. These arguments have been previously addressed and rejected by this court. (See *People v. Burrows* (1992), 148 Ill. 2d 196, 259-60.)

Defendant fails to persuade us to reconsider this court's prior holdings.

Finally, defendant has cited to a Federal district court decision in support of the contention that the death penalty statute imposes a presumption in favor of death, is unconstitutionally vague, fails to narrowly channel and guide the sentencer's discretion, and because it fails to assign a specific standard of proof as to the ultimate issue. (*United States ex rel. Free v. Peters* (N.D. Ill. September 24, 1992), No. 89—C—3765.) We are unpersuaded by the data relied upon in the *Free* decision, and continue to support the constitutionality of the Illinois death penalty statute.

## CONCLUSION

For the above reasons, we affirm the judgment of the circuit court. The clerk of this court is directed to enter an order setting Tuesday, January 11, 1994, as the date on which the sentence of death entered by the circuit court of St. Clair County is to be carried out. Defendant shall be executed in the manner provided by law. (Ill. Rev. Stat. 1989, ch. 38, par. 119—5.) The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to warden of the institution wherein the defendant is now confined.

*Affirmed.*