THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROSEMARIE LOMBARDI, Defendant-Appellant.

Second District No. 2—98—0319

Opinion filed May 17, 1999.

34

Michael D. Ettinger and Joseph A. Parisi, both of Michael D. Ettinger & Associates, P.C., of Palos Hills, for appellant.

Joseph E. Birkett, State's Attorney, of Wheaton (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Raymond J. Cicci, of Springfield, for the People.

JUSTICE McLAREN delivered the opinion of the court:

The defendant, Rosemarie Lombardi, appeals her conviction of theft (720 ILCS 5/16—1(a)(1) (West 1996)) and sentence of 24 months' probation. We affirm.

In June 1997, the defendant was charged by indictment with one count of theft, alleging that the defendant exerted unauthorized control of currency exceeding $300 from Tamarac Townhouse Association, intending to permanently deprive the association of the benefits of such property. A bench trial began on September 5, 1997.

Jose Miguel Diokno, a board member of the Tamarac Townhouse Association (Tamarac), located in Addison, Illinois, testified that the defendant was elected to the board of directors of Tamarac sometime before July 1994. In January 1997, the defendant took over Tamarac's financial affairs. Although Tamarac's bylaws permitted board members to receive compensation, no oral or written agreement existed between Tamarac and the defendant authorizing compensation for the defendant's services.

Andrea Kozyra, another board member of Tamarac, corroborated Diokno's testimony that there was no agreement to compensate the defendant for her services. Further, the defendant never told Kozyra that she withdrew $4,500 from the Tamarac account as compensation for her services.

The State introduced evidence of the defendant's alleged withdrawals from Tamarac's St. Paul Federal (St. Paul) bank account. People's exhibit No. 1 was a history of Tamarac's account from January through March 1997; exhibit No. 2 consisted of copies of Tamarac's checks processed by St. Paul for the same period; exhibit No. 3 consisted of copies of deposit and withdrawal slips of the Tamarac account from January through April 1997; exhibit No. 4 consisted of Tamarac's checking account statements from January through April 1997; exhibit No. 5 was a summary of the information contained in exhibits one through four prepared by the State; exhibit No. 7 consisted of Tamarac's financial statements from January 1 through May 1997; and exhibit No. 9 consisted of Tamarac's bank statements retrieved by the Addison police from the defendant. Exhibits Nos. 1 through 4 revealed cash withdrawals and checks made out to the defendant totaling $4,600. The defendant offered receipts in the amount of only $200. Exhibit No. 7 did not show any compensation paid to the defendant.

Charles Christian Dvorak, corporate vice-president of St. Paul, was responsible for programming and systems development. Dvorak had held this position for over 4 years and had worked in the data processing area for over 10 years. According to Dvorak, St. Paul's com-

puter system consisted of three separate systems: an IBM mainframe (the host computer and repository for all customer records), a Tandom computer system (which processed automated teller machines and point of sale transactions), and a Compaq system (a teller platform system). All three systems were connected. The IBM mainframe was less than two years old and used software specifically designed for banks such as St. Paul. In fact, this software was used by other banking institutions. The Tandom system used A.C.I. software, and the Compaq computers used a specialized bank transaction software to link the tellers of all 54 branch offices with the IBM mainframe. The Compaq software was used by over 500 banking institutions.

Dvorak also testified that the computer systems were audited by three different auditing entities: an outside auditor (Ernst & Young); internal auditors; and a federal regulatory agency (the Office of Thrift Supervision). An electronic processing auditor also audited the data processing systems for integrity and accuracy. In addition, tellers and each branch balanced every day, and these balances were then checked against the IBM mainframe.

Dvorak explained that People's exhibits Nos. 1 and 4 were account histories printed from the St. Paul mainframe computer system in conjunction with the teller platform computer system. Exhibit No. 1 was an account history for January through March 1997, used internally by St. Paul, and exhibit No. 4 was an account history for January through April 1997 mailed to the customer monthly. Both exhibits displayed Tamarac's account number. The information contained in both exhibits Nos. 1 and 4 was entered into the St. Paul computer system immediately and instantaneously updated information stored in the IBM mainframe. Teller transactions updated the IBM mainframe instantaneously, and checks cleared daily by the "fed" were posted and also updated in the IBM mainframe daily. Bank tellers and other bank personnel entered transactions into the St. Paul computer system immediately as they occurred.

According to Dvorak, attached to Tamarac's customer statements (exhibit No. 4) were copies of checks written on the account and copies of withdrawal and deposit slips for the statement period. The check images were created by a machine which read the checks and created the photocopy-like images. The withdrawal and deposit slips were produced at the teller window by the bank teller platform system. Dvorak stated that the information contained in both exhibits Nos. 1 and 4 was created in the normal course of bank business. He further stated that no unauthorized person has ever gained access to the St. Paul computer system.

Janet Schuda, St. Paul operations manager and former branch

manager, testified that she was familiar with the creation and keeping of business and transaction records for St. Paul. She explained that exhibit No. 2 consisted of microfilm copies of actual checks processed on the Tamarac account and exhibit No. 3 consisted of copies of deposit and withdrawal slips from the Tamarac account, filled out at the time of the transaction and presented to tellers at St. Paul. Schuda also testified that exhibits Nos. 1, 2, and 3 were records made and kept in the ordinary course of business. People's exhibit No. 4 contained the same information as that contained in exhibit No. 1. The information contained in exhibits Nos. 1, 2, 3, and 4 were true and accurate copies. Schuda stated that she produced part of exhibit three and checked all of the other exhibits.

Detective David Wall of the Addison police department testified that the defendant gave him certain documents (People's exhibit No. 9) in May 1997. The documents consisted of Tamarac bank statements from January through April 1997, records of assessments and receipts, and Tamarac records relating to bills, receipts, and invoices.

Wall also testified that the defendant admitted that she did not have an agreement with Tamarac to provide her with compensation for her services. The defendant also admitted that she took about $2,000 from Tamarac, explaining that her father was ill and that she used the money to pay for her father's unpaid medical bills. The defendant then provided the following written statement:

> "At the beginning of this year my father became very ill, diagnosis tumor and therefore needed chemotherapy treatments above and beyond health insurance coverage. I at some point [copy is unclear] miscellaneous expenses incurred about $2,000 overage. After receiving receipts and documents to help cover expenses of health. I am truly sorry, I did not intentionally deprive anyone and after realization would like to make restitution for what is truly not mine to keep."

At the close of the State's case in chief, the trial court denied the defendant's motion for a directed finding of not guilty. The defendant called two character witnesses and then rested. The defendant did not testify. On September 19, 1997, the trial court heard closing arguments by both sides and continued the cause to September 29, 1997, for a ruling.

However, on September 29, 1997, the trial court noted that the defendant had not filed a jury waiver and stated that it wanted to correct the matter before it took the case under advisement. Defense counsel told the trial court that the defendant did not wish to waive her right to a jury trial and that she wanted the trial court to render its decision. The trial court admonished the defendant that she had a

right to a trial by jury, which meant that a panel of 12 jurors would be selected to hear the evidence and make a determination of her guilt or innocence. The trial court told the defendant that if she wanted a jury trial it would give her one but that she could not have it both ways. Defense counsel asked the judge to give the defendant time to think about it and asked that the matter be postponed until October 6, 1997.

On October 6, 1997, defense counsel told the trial court that he had explained to the defendant her rights on numerous occasions and the defendant wanted the court to render its judgment. The trial court explained to the defendant again that, if she wanted a jury trial, it would declare a mistrial and a trial with a jury would proceed, but that if she wanted it to render a decision she would have to sign a waiver of the jury trial rights. At this point the following admonishment and colloquy occurred:

"THE COURT: Ms. Lombardi, do you understand—let me explain it to you again. You had a right to have a trial by a jury and that right is something that you would have to determine upon consultation with your attorney, but the eventual decision is yours as to what you want to do in that respect.

You are entitled to a jury trial where we would have brought in a number of jurors, and the attorneys, through the Court, would have picked 12 of those people to serve as jurors in this case and they would have determined whether or not you were guilty of the offense charged. The alternative is a bench trial, which we have already had in this case, which a bench trial is where the evidence is presented and I will make a determination as to whether you are guilty or not guilty of this offense. ·

Even at this stage of the proceedings, even though we have gone through the bench trial, if you told me you didn't understand that you had a right to a jury trial, and that is what you actually wanted was a jury trial, at your request I would then declare a mistrial of the bench trial and have the matter reset down for trial and require the State to again present their evidence to a jury and let a jury make a determination as to whether you were guilty of this offense. Do you understand the rights you have?

DEFENDANT LOMBARDI: (no audible response).

THE COURT: Your answer?

DEFENDANT: Yes.

THE COURT: What is your choice this morning?

DEFENDANT: I feel that we went through the trial already before your Honorable Court and even though I was not aware that I had the right for a jury trial, that I feel that by my signing this that you will render your decision and your verdict [sic].

THE COURT: But I want you to understand that even at this stage, if you told me that you want a jury trial, that I would, in fact, declare a mistrial of a bench trial and set the matter down for a jury trial so that you could have the right. Do you understand that?

DEFENDANT: Yes.

THE COURT: Is it your choice to waive your right to a trial by jury?

DEFENDANT: Yes.

THE COURT: Have you talked to your attorney about this?

DEFENDANT: Yes.

THE COURT: You have discussed that with him?

DEFENDANT: Yes.

THE COURT: You are doing this freely and voluntarily?

DEFENDANT: Yes.

THE COURT: No one has forced you to do this; is that correct?

DEFENDANT: That's correct.

THE COURT: All right. I will accept the jury waiver."

The defendant signed a written jury waiver. The trial court then reopened the proofs and permitted the defendant to present the testimony of two witnesses. The cause was continued to October 23, 1997.

On October 23, 1997, the trial court found the defendant guilty of theft. On February 27, 1998, the trial court denied the defendant's motion for a new trial. This timely appeal followed.

The defendant first contends that she is entitled to a new trial because she did not knowingly waive her right to a jury trial since she was admonished of her rights 17 days after the trial began and acknowledged to the trial court that she did not understand she had a right to a jury trial. The State argues that the defendant knowingly waived her right to a jury trial because defense counsel requested a bench trial in her presence and the defendant signed a written jury waiver before the trial ended. We agree with the State.

 "Every person accused of an offense shall have the right to a trial by jury unless (i) understandingly waived by defendant in open court ***." 725 ILCS 5/103—6 (West 1996). The determination of whether a defendant understandingly waived his right to a jury trial turns on the facts and circumstances of each particular case. *People v. Lake*, 297 Ill. App. 3d 454, 458 (1998). No set admonition or advice is required before an effective waiver is made, and whether it was made understandingly turns on the facts and circumstances of each case. *People v. Tooles*, 177 Ill. 2d 462, 469 (1997). Although a written jury trial waiver alone does not demonstrate the defendant's understanding, a signed written waiver lessens the probability that the waiver

was not knowingly made. *People v. Dockery*, 296 Ill. App. 3d 271, 276 (1998). Further, a knowing oral waiver can be found where, in the accused's presence and without objection from the accused, defense counsel expressly advises the court of the accused's desire to proceed by a bench trial. *Lake*, 297 Ill. App. 3d at 458. In this way, our supreme court explained in *People v. Frey*, 103 Ill. 2d 327 (1984), the accused will not be permitted " 'to gamble on the outcome before the judge without a jury and then if dissatisfied make a belated demand for a jury.' " *Frey*, 103 Ill. 2d at 333, quoting *People v. Novotny*, 41 Ill. 2d 401, 409 (1968). Thus, the appellate court found a knowing waiver in *People v. Asselborn*, 278 Ill. App. 3d 960 (1996), where the following colloquy occurred between the trial court and defense counsel in the presence of the defendant:

" 'THE COURT: Have a seat. Jury waiver. Bench or jury?

MR. LEVIN [Defense Counsel]: It will be a bench your Honor.' " *Asselborn*, 278 Ill. App. 3d at 962.

Similarly, in the case at bar before the bench trial began, the trial judge asked if "both sides are ready to start." Defense counsel answered, "ready for the bench trial on the charges brought before you." Later, defense counsel stated, "We wish to proceed on the bench trial as planned." Nothing in the record indicates that the defendant was not present at this time, and the defendant made no objection. Thus, we must conclude that the defendant knowingly waived her right to a jury trial.

■ Assuming, *arguendo*, the defendant did not knowingly waive her right to a jury trial before the bench trial began, the record indicates that the defendant knowingly waived her right before the bench trial was completed. After closing arguments but before the trial court took the matter under advisement, the trial court noted that there was no indication that the defendant had waived her right to a jury. Defense counsel told the trial court that the defendant wanted the trial court to render its decision without waiving her right to a jury trial. The trial court admonished the defendant, explained what a jury trial is and told her that it would provide one if the defendant desired, but that she could not have it both ways. At defense counsel's request, the trial court continued the cause to give the defendant time to think about it. Subsequently, defense counsel told the trial court that he had explained the defendant's rights to her on numerous occasions and that the defendant wanted the trial court to render its finding. The trial court again explained to the defendant that it would declare a mistrial and proceed with a jury trial if the defendant so desired or she could waive her right in writing and it would render its finding; it fully admonished the defendant of her right to a

jury trial. The defendant then stated that she understood her right to a jury trial and waived that right. Further, the defendant signed a written waiver and stated that she discussed the matter with her attorney and freely and voluntarily waived her right without threat of force. Thus, although the bench trial was near its conclusion, the trial court gave the defendant every opportunity to demand a jury trial, and, after being completely admonished of her rights, the defendant knowingly waived her right to a jury trial.

The defendant argues that she was coerced into waiving her right to a jury trial because the trial court forced the defendant to "either concede to the trial court's demand for a jury waiver" or face indefinite continuances or another trial. The record does not support the defendant's argument. The record reveals that the trial court gave the defendant every opportunity to request a jury trial. The trial court repeatedly told the defendant that if she desired a jury trial a mistrial would be declared and she would be given a jury trial. However, the defendant wanted it both ways: she wanted the trial court to rule and then she wanted to decide whether she wanted another bite at the apple by requesting a jury trial. The fact that the trial court refused to allow the defendant " 'to gamble on the outcome before the judge without a jury and then if dissatisfied make a belated demand for a jury' " (*Frey*, 103 Ill. 2d at 333, quoting *Novotny*, 41 Ill. 2d at 409) does not mean that the trial court coerced the defendant into waiving her right.

Further, the defendant argued that the trial court forced her to choose between two constitutional rights, *i.e.*, the right to a jury trial and the right to be free from a successive trial constituting double jeopardy. This argument is meritless. A retrial after a mistrial is barred under the double jeopardy clause only when " ' "bad-faith conduct by judge or prosecutor" [citation] threatens the "[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecutor a more favorable opportunity to convict" the defendant.' " *People v. Segoviano*, 297 Ill. App. 3d 860, 868 (1998) (leave to appeal granted, 181 Ill. 2d 586 (1998)), quoting *Lee v. United States*, 432 U.S. 23, 33, 53 L. Ed. 2d 80, 89, 97 S. Ct. 2141, 2147 (1977). There is nothing in the record to indicate that either the trial judge or the prosecutor acted in bad faith to provoke a mistrial. Thus, this argument fails.

*People v. Simpson*, 24 Ill. App. 3d 835 (1974), is distinguishable from the case at bar because, unlike the case at bar, there was evidence of actual coercion in *Simpson*. In *Simpson*, the State tendered voluminous discovery materials to the defense two weeks before trial. The trial court granted a continuance only after the defendants waived

their rights to a jury trial. *Simpson*, 24 Ill. App. 3d at 838. The trial court in this case attached no such conditions to the defendant's choice. *People v. Eyen*, 291 Ill. App. 3d 38 (1997), is also distinguishable from the case at bar because in *Eyen* the issue of a jury trial was not raised in the defendant's presence until after the sentencing (*Eyen*, 291 Ill. App. 3d at 40-41). Here, the defendant waived her right before the bench trial was completed. *People v. Collins*, 9 Ill. App. 3d 185 (1972), is distinguishable from the case at bar because, unlike the defendant in the case at bar, the defendant in Collins *never* waived his right to a jury trial. Further, the defendant's reliance on *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981), is misplaced. *Edwards* addressed a defendant's *Miranda* rights, holding that once a defendant indicates his right to remain silent an interrogation must end. Contrary to the defendant's argument, *Edwards* is not controlling here; the defendant in the case at bar waived her right to a jury trial through her attorney prior to trial and then waived the right both orally and in writing before the trial was completed.

Next, the defendant argues that the trial court erroneously admitted exhibits Nos. 1 through 4 and No. 9 into evidence. The defendant claims that the State failed to lay a proper foundation to admit the computer-generated business records as an exception to the hearsay rule. The State argues that the trial court properly admitted the computer records.

■ It is well settled that "computer-generated business records are admissible under the business records exception to the hearsay rule if a proper foundation has been laid." *People v. Bovio*, 118 Ill. App. 3d 836, 841 (1983). However, before a computer-generated record may be admitted into evidence it must be shown that "(1) the electronic computing equipment is recognized as standard; (2) the input is entered in the regular course of business reasonably close in time to the happening of the event recorded; and (3) the foundation testimony establishes that the sources of information, method and time of preparation indicate its trustworthiness and justify its admission." *People v. Bynum*, 257 Ill. App. 3d 502, 512 (1994). Absent an abuse of discretion, we will not disturb a trial court's decision to admit evidence under the business records exception to the hearsay rule. *People v. Morrow*, 256 Ill. App. 3d 392, 396 (1993).

■ The defendant argues that the State failed to establish that St. Paul's computer software and hardware were standard in the industry, particularly because the A.C.I. teller software was 15 years old and its manufacturer was no longer in business. In addition, the defendant argues it was not established that St. Paul was operating the software correctly or which computer system produced which records. The de-

fendant also asserts that the State failed to establish that the records at issue were made in the regular course of business at or reasonably near the time of the transactions, particularly because there was no evidence regarding who made the entries, in what manner they were made, or whether the computer system performs calculations, merely retrieves information, or performs both functions. In addition, the defendant asserts that the State failed to establish whether the source of information, the method, and the time of preparation are such to indicate trustworthiness and justify admission, particularly because the State's witnesses did not verify the accuracy of the exhibits.

However, the defendant ignores Dvorak's and Schuda's testimony. Dvorak testified that the information contained in exhibits Nos. 1 and 4 was immediately entered into the computer system by tellers or automatic teller machines and was stored in the mainframe computer instantaneously and that the records were made in the ordinary course of business. Schuda testified that the copies of checks in exhibit No. 2 were created by a microfiche machine by bank personnel and were made in the ordinary course of business. The deposit and withdrawal slips contained in exhibit No. 3 were filled out at the time of the transaction by the customer and kept in the ordinary course of business. Regarding verification and accuracy, Dvorak testified that the computer systems were audited by three separate auditing entities and that the tellers and branches were reconciled and balanced with the computer system each day.

We acknowledge that the State did not specifically elicit testimony that St. Paul's computer system was standard in the industry. However, Dvorak testified that the mainframe software was used by other banking institutions and the Compaq software was used by over 500 banking institutions. Further, the ultimate issue is whether the foundation sufficiently guarantees trustworthiness to justify introduction. See *People v. Tsombanidis*, 235 Ill. App. 3d 823, 835 (1992). After reviewing the record, we determine that the information was sufficiently trustworthy.

■ In addition, we believe the State properly authenticated exhibit No. 9. "Authentication can be established by direct and/or circumstantial evidence." *People v. Towns*, 157 Ill. 2d 90, 104 (1993). The defendant gave these documents to Detective Wall in response to his request for Tamarac Townhome Association's records. The defendant was the president of Tamarac at the time. The documents were either addressed to Tamarac or bore the Tamarac name. In addition, the information contained therein is identical to the information contained in exhibits Nos. 1 and 4. Thus, the trial court properly admitted exhibits Nos. 1 through 4 and No. 9 into evidence. However, even if exhibit No.

9 was improperly admitted, its admission was not prejudicial because the information contained therein was duplicative of other admissible evidence.

The defendant cites *People v. Bovio*, 118 Ill. App. 3d 836, 841 (1983), to support her argument regarding the inadmissibility of the exhibits. This case is distinguishable from the case at bar. In *Bovio*, the evidence did not establish that the documents were trustworthy: there was no evidence regarding the type of computer system used, how transactions were entered into the computer, or the accuracy of the information. *Bovio*, 118 Ill. App. 3d at 841-42. Conversely, in the case at bar, Dvorak described St. Paul's computer system, explained what type of computers and software programs were used, and stated that the tellers and automatic tellers entered the information; he explained that there were three separate auditors and that the systems were balanced every day. Thus, we believe the State presented sufficient evidence to establish the trustworthiness of the computer records. Accordingly, *Bovio* is not controlling here.

■ In addition, assuming *arguendo* all the exhibits at issue were improperly admitted, their admission does not warrant reversal because the evidence supporting conviction was overwhelming. The admission of improper evidence is harmless beyond a reasonable doubt where there is overwhelming evidence of guilt. *People v. Rice*, 234 Ill. App. 3d 12, 22 (1992). In the case at bar, Detective Wall testified that the defendant admitted that she took about $2,000 from Tamarac and explained that she used the money to pay for her father's unexpected medical bills. Further, the defendant stated in her own handwriting that she incurred $2,000 in expenses and that she did not "intentionally deprive anyone" and would "like to make restitution for what truly is not mine to keep." A Tamarac financial statement (exhibit No. 7) did not show any compensation paid to the defendant, and there was no evidence that the Tamarac Board agreed to compensate the defendant for her services. Thus, even if the exhibits at issue were improperly admitted, the error does not warrant reversal.

The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

RAPP and GALASSO, JJ., concur.