THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MAXIMINO MALDONADO, a/k/a, JOSE COLLAZO, a/k/a, FELIX CQUENDO, Defendant-Appellant.

(No. 54649;

First District—December 20, 1971.

Gerald W. Getty, Public Defender, of Chicago, (Fred Shandling and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Terrence Mahoney, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE LYONS delivered the opinion of the court:

Maximino Maldonado was convicted, following a jury trial, of the offense of involuntary manslaughter (Ill. Rev. Stat. 1967, ch. 38, par. 9—3(a)). Judgment was entered on the verdict and he was sentenced to a term of not less than seven nor more than ten years in the Illinois State Penitentiary. On appeal defendant contends:

1) that he was denied a fair trial when the prosecutor introduced into evidence his pre-trial statement without excising from it admissions of prior arrests for traffic offenses, a prior conviction for driving while intoxicated, and a subsequent arrest for driving while intoxicated;

2) that the trial court erred in allowing into evidence the details of his arrest two years after the crime charged, as that evidence tended to establish the commission of an unrelated offense;

3) that the indictment is constitutionally defective in that it is not sufficient to inform him of the nature and cause of the accusation and to protect him from double jeopardy since it did not allege specific acts which would constitute recklessness;

4) that the jury was insufficiently instructed on the crime charged as the term "recklessness" was not defined;

5) that he was denied a fair trial when the prosecutor, during argument, implied that defense counsel had attempted to suppress evidence;

6) that he was denied effective assistance of counsel;

7) that he was not proven guilty beyond a reasonable doubt; and

8) that the trial court erroneously considered his arrest record in determining sentence.

At trial Chicago Police Officer Jack Hawkonsen testified that at approximately 6:30 P.M. on January 22, 1967, he was on patrol in a police vehicle and was proceeding south on Halsted Street. When he was 300 feet north of the intersection of Halsted and Wrightwood Avenue, he noticed a traffic jam at the intersection. He then observed a Buick automobile which was facing east into Wrightwood back up for a short distance and then speed away in a southerly direction in the northbound lanes of Halsted Street. He followed the Buick in the same lanes in an attempt to apprehend it. During the chase, his car attained the speed of 65 miles per hour and the Buick was still pulling away from him. He estimated the speed of the Buick at between 65 and 70 miles per hour.

As the Buick reached the intersection of Halsted and Fullerton Avenue, the traffic control signal for Halsted was red. The officer observed what appeared to be two pedestrians at that intersection and, as the Buick passed through it he observed objects hurtling through the air. At this point the officer placed an emergency call over the radio. The

Buick continued on past the intersection and then began to spin around, striking some parked cars, and eventually came to rest against a fence.

Four occupants of the car exited the door on the right side of the vehicle and began to run west on Belden Avenue, a street 50 feet south of where the Buick had come to rest. One of their number then reversed his direction and ran east. Officer Hawkonsen chased this individual on foot and apprehended him. He is now known to the officer as Hector Collazo. The officer attempted to open the driver's door on the Buick and found it to be jammed.

Officer Hawkonsen then returned to the intersection of Halsted and Fullerton with the arrestee. He observed the body of a young female some 25 feet beyond the intersection and the body of another young female some 200 feet beyond the intersection beneath the wheel of a parked truck. Hector Collazo informed him that Louis Collazo had been driving the Buick automobile.

Officer Hawkonsen further testified that he overheard a conversation in the police station later that same evening in which the defendant, known to him as Maximino Maldonado, stated that Ramon Vasquez was the driver of the vehicle. Also in the police station that same evening, he had a conversation with an individual known to him as Ramon Vasquez in which that party admitted to having been the driver of the Buick. As a result of the conversations in the police station the officer charged Ramon Vasquez with the killing of the two girls, speeding, going through a red light, driving without a license, driving while intoxicated, and leaving the scene of an accident involving personal injuries.

Officer Tom Kelley was also on patrol in a squad car near the intersection of Halsted and Wrightwood at approximately 6:30 P.M. on January 22, 1967. His testimony concerning the events preceding the striking of the pedestrians was substantially the same as that of Officer Hawkonsen. He further testified that after seeing the female figure flying through the air at the intersection of Halsted and Fullerton, he stopped his car at that intersection. He observed the body of a young girl lying between parked cars approximately 60 to 80 feet from the intersection. When he returned to his car to call for an ambulance, an unidentified individual approached and informed him of another body lying beneath a truck 100 to 150 feet to the south. The officer proceeded to investigate and discovered the body of a young female, as had been indicated to him, lodged beneath the wheel of a parked truck. He enlisted the aid of several bystanders in lifting the rear portion of the truck and removing the body. He was not able to discern any signs of life in either of the bodies.

Following removal of the bodies by ambulance, Officer Kelley went to

the area where the Buick automobile had come to rest. He examined the interior of the car and in so doing discovered a man's left shoe wedged between the driver's foot pedals. People's Exhibit 12 is that shoe.

Later that same evening he arrested the defendant in the attic of the building in which Ramon Vasquez lived. When found, defendant was behind some debris in the attic and was wearing only one shoe, the right. Kelley later determined that the shoe which defendant was wearing at the time of his arrest, People's Exhibit 13, appeared to be the mate to the shoe which he had recovered from the Buick automobile.

Hector Collazo, an occupant of the automobile, testified as follows. He is the nephew of Ramon Vasquez and William Vasquez who were also occupants of the vehicle in question. The first time he heard the defendant use the name Maximino Maldonado was in the police station following his arrest. He had known the defendant as Louis Collazo.

On the date in question defendant arrived at his home at approximately 6:00 P.M. He and the defendant, along with William Vasquez and Ramon Vasquez went to another apartment in the building to have some beer. They remained there and drank for about one half hour. Hector himself did not have anything to drink, but the three others became intoxicated. He invited William and Ramon to accompany him to the theater. William accepted the invitation but Ramon declined, saying that he wished to go home. Defendant offered to drive them and they left in his car. Defendant was driving, the witness sat in the center of the front seat with Ramon to his right. William sat in the back seat alone.

Defendant drove north on Halsted Street and when he attempted to execute a right turn he struck a parked car. He then sped away in a southerly direction on Halsted Street. The front end of the car was raised in the air and the car was traveling at its maximum speed. When the car passed through a red light the witness heard a thump. The car continued on and began to spin, eventually coming to a halt against a curb. At that point defendant said "Let's go" and the other occupants began to abandon the car. Ramon was the first to exit. Then defendant effected his exit by jumping over the witness. He was followed by William, and finally by the witness. After leaving the car the witness was arrested and later that same evening in the police station he informed the police that defendant had been driving.

On cross-examination Hector testified that although he had been looking forward, he did not see the victims at any time. He also denied ever having stated that Ramon Vasquez was the driver of the car.

William Vasquez testified to substantially the same facts as had Hactor Collazo. In addition, he testified that following the impact of the victims being struck by the automobile, the defendant stated, "We hit somebody." He denied ever having stated that Ramon Vasquez was the driver of the car, but was impeached on this point by the use of a prior statement. He also testified that he had not known defendant by the same of Maximino Maldonado.

Ramon Vasquez, the final occupant of the auto, excepting the defendant, testified to the same circumstances up to the time of the first striking of a parked auto as had the other occupants of the car. He stated, however, that when a second car was struck he bumped his head and remembers nothing thereafter prior to his arrest later that evening.

At the police station following his arrest he had a conversation with the defendant in which defendant asked him to admit to having been the driver of the automobile, as he (defendant) had several cases pending against him and that such an admission on his part would be an aid. He promised the witness that he would secure a lawyer for him. The witness, not knowing that two girls had been killed, made such an admission to the police. However on the following day when he learned of their deaths, he recanted the statement.

Gregory Sluzka testified that he was in his car at the intersection in question waiting for the traffic control signal to change in favor of traffic on Fullerton. Immediately after it did so change, he heard a loud noise and then observed an automobile pass through the intersection in a southerly direction. Its speed was between 50 and 70 miles per hour. As the car passed through the intersection, he saw papers fly through the air. He drove through the intersection, parked his car, and walked back. He observed the bodies of two females in the street. The first was 50 to 60 feet from the intersection and the second was further down the street beneath the wheel of a truck.

While at the scene he spoke with a man who inquired of him as to what had happened. The man, the defendant here, was wearing a right, but not a left shoe and smelled strongly of alcohol.

David Marr, another occurrence witness, testified that he was at the intersection of Halsted Street and Fullerton Avenue at the time in question and passed the victims and their mother in the street as he crossed Halsted from west to east. At about the time he reached the east side of the street he heard a horn sound and turned around. At that instant he observed a car strike the victims and also knock their mother to the pavement. He estimated the speed of the car at 70 miles per hour.

Additional witnesses presented by the State whose testimony was

related to the occurrence established the identities of the victims as Helen Trakas, age 15, and Ourina Trakas, age 18, and the cause of their deaths to be multiple internal injuries.

Otto Stuparitz, an evidence technician for the Chicago Police Department, testified that at 8:40 P.M. on the date in question he administered a breathalyzer test to the defendant, which test resulted in a reading of .240. Under the statute then in force (Ill. Rev. Stat. 1965, ch. 95½, Art. V, par. 144) a reading of .150 raised a presumption that the person tested was under the influence of alcohol.

Police Officer Terry G. Hilliard testified that while on duty on January 24, 1969, he was informed by radio communication that a man was slumped over the wheel of an auto which was blocking traffic at North and Sheffield Avenues. He and his partner proceeded to that intersection where they observed an auto blocking traffic. Defendant was slumped over the wheel and appeared to be in a drunken condition. He produced a driver's license bearing the name Antonio Arroyo and was then transported to the police station and fingerprinted. A subsequent check of the prints taken indicated that they did not correspond with the name of the licensee on the driver's license which defendant had produced.

The State read into evidence a statement taken from the defendant in January, 1969, in which he admitted that he had been drinking at the home of William Vasquez and at a bar prior to the occurrence in question and that he was drunk prior to the occurrence, but denied that he was the driver of the vehicle involved. This statement also contains admissions with respect to a conviction in the State of New York for drunken driving, an arrest on another traffic offense, and also the arrest to which Officer Hilliard testified. Defendant also stated therein that following the striking of the girls the door next to which he was sitting (right door) opened and he was thrown to the pavement, losing his shoes in the process. He sustained no injuries, not even abrasions or contusions as a result of being so thrown from the vehicle. He fled to the home of Ramon Vasquez where he was later arrested. He was in the kitchen at the time of his arrest.

Other evidence presented by the State consisted of the testimony of two witnesses which tended to establish that between February of 1967, and January of 1969, defendant was employed under names other than Jose Collazo (apparently his true name), Louis Collazo, Antonio Arroyo, and Maximino Maldonado. One of these witnesses testified that he was employed under the name Felix Oquendo.

■■ Defendant first contends that he was denied a fair trial when the prosecutor read into evidence his pre-trial statement without first having excised from it certain admissions with respect to arrests for

traffic violations and a conviction in New York State for driving while intoxicated, relying on *People v. Donaldson* 1956, 8 Ill.2d 510, 134 N.E.2d 776; *People v. Oden* 1960, 20 Ill.2d 470, 170 N.E.2d 582; *People v. Gregory* 1961, 22 Ill.2d 601, 177 N.E.2d 120. Those cases stand for the proposition that evidence of offenses unrelated to the one for which defendant is on trial are incompetent, and where such evidence is contained in an otherwise admissible statement or confession they must be excised unless to do so would seriously impair its evidentiary value. These cases are founded upon the salutary principle that evidence of unrelated offenses is not admissible to establish defendant's propensity to commit crime. However, in cases such as the present where that evidence, even though tending to establish the commission of an unrelated offense, is relevant for another purpose, it is admissible. (*People v. Palmer* 1970, 47 Ill.2d 289, 265 N.E.2d 627; *People v. Cole* 1963, 29 Ill.2d 501, 194 N.E.2d 269.) Here another individual (Ramon Vasquez) who first admitted to having been the driver of the offending vehicle testified at trial that defendant was the driver and explained the previous admission on his part as an accommodation to the defendant made in ignorance of the fact of the deaths of the victims. He testified that the defendant approached him while they were in the police station and requested that he make the admission, explaining that he had several cases against him and that if it were to be discovered that he was the driver of the vehicle things would go badly for him. The request was accompanied by a promise that legal counsel would be furnished. Thus the admissions contained in the statement given by the defendant were relevant to corroborate the testimony of Ramon Vasquez concerning the reason for his initially having admitted to being the driver of the car.

■■ Defendant also asserts as error the trial court's allowing into evidence the details of his arrest two years subsequent to the occurrence which resulted in the deaths of Helen and Ourina Trakas. The State introduced the testimony of several persons which tended to establish that for two years following the occurrence out of which the present charges arose the defendant secreted himself within the community through the use of false identities. The testimony concerning his arrest was but the final link in this chain of evidence which was admissible as indicative of a consciousness of guilt. Thus it too was properly admitted under the authority of the Palmer and Cole decisions.

Relying on *People v. Griffin,* 1967, 36 Ill.2d 430, 223 N.E.2d 158 and *People v. Peters,* 1957, 10 Ill.2d 577, 141 N.E.2d 9, defendant next contends that the indictment was insufficient to inform him of the nature and cause of the accusation and protect him from double jeopardy in that it failed to allege specific acts which would constitute recklessness.

In *Griffin* the Supreme Court held that an information for reckless driving cast in the language of the statute (Ill. Rev. Stat. 1965, ch. 95½, par. 145) in which no specific act was alleged was insufficient to advise the accused of the nature and cause of the accusation and to afford protection from double jeopardy. The court reasoned that since any number of acts could constitute the offense, the accused was not advised of the nature of the charge and totally unprotected from the danger of being tried for the offense based upon one act, such as speeding, and later being again prosecuted for the same offense with another act being asserted, such as violating a traffic control signal.

A similar result obtained in the *Peters* case. There it was held that an information charging the defendant with a violation of Ill. Rev. Stat. 1953, ch. 38, par. 298 by unlawfully representing himself as authorized to practice law was defective for failure to allege the act which constituted the representation.

In each of the cited cases the particular act would, of itself, be sufficient to constitute the offense.

■■ The gravamen of the offense of involuntary manslaughter, on the other hand, is the killing of an individual without lawful justification as the result of the reckless performance of some act, whether lawful or unlawful, which is likely to cause death or great bodily harm. Thus, unlike the offenses charged in the *Griffin* and *Peters* cases, the act itself is not sufficient to constitute the offense. That being the case, this court has held that to properly charge the offense of involuntary manslaughter it is necessary only to charge that the defendant killed another while he was in the performance of an unlawful act. (*People v. Adams*, 1969, 113 Ill.App.2d 276, 252 N.E.2d 65.) We believe the same conclusion must be reached where the indictment charges that the act performed by the defendant was reckless rather than unlawful. This distinction between the offenses charged in the cases relied upon by the defendant and the offense of which he was charged and stands convicted also negatives the possibility that defendant might be twice placed in jeopardy for the same offense, for no matter the number of acts which might be alleged, proof of a homicide must accompany the proof of the act, and there can be no danger that he be charged with a second killing of the same victim.

■■ It is also argued that the jury was insufficiently instructed on the offense charged since the trial court failed to instruct the jury as to the meaning of the term "reckless" on its own initiative. The Criminal Code defines the term in generalities to the end that the definition may be applied to an infinite variety of acts. While it would seem desirable to instruct the jury in the language of the Code wherever possible, we are

convinced that the failure of the court to do so in the instant case did not work a substantial prejudice upon the defendant. The general definition of "recklessness" contained in section 4—6 of the Code (Ill. Rev. Stat. 1965, ch. 38, par. 4—6), when applied to the factual situation developed by the State's uncontradicted evidence relating to the manner in which the victims met their deaths, does not differ from the meaning of the term as commonly understood. Thus the fact that the jury was not instructed as to the statutory definition of the term did not constitute reversible error. (e.g., the term "reckless" when applied to the act of driving an automobile is defined by Webster's Third International Dictionary as "driving that evidences a deliberate or culpably negligent disregard of life and property and creates an unreasonable risk of harm to others.")

■■■ Defendant next contends that he was denied a fair trial when the prosecutor, during closing argument, made reference to an objection propounded by defense counsel following the prosecutor's suggestion that defendant be made to try on the shoes marked as State's Exhibits 12 and 13. Relying on *People v. Munday* 1917, 280 Ill. 32, 117 N.E. 286, defendant argues that such reference was highly prejudicial in that it constituted an attempt to convey to the jury the impression that defense counsel was attempting to suppress damaging evidence. While we agree with defendant that the fact of or reasons for objections being made to the introduction of evidence is of no concern to the jury in the proper performance of their function, we do not find the decision in Munday to require reversal of the present case. Here actual comment made during argument was: "* * * We asked him to put the shoes on. They did not want that. But they did, he did put the shoes on and you saw him walk here. * * *" This comment, while not to be condoned, can in no manner of imagination be equated with the transgressions of the prosecutors in the Munday case. There the court considered each of the following statements in reaching its determination that the closing argument of the prosecutors denied the defendant of a fair trial. 1) When the prosecutor made reference to defendant's failure to call co-indictees as witnesses and defense counsel objected, the prosecutor, in the presence of the jury, volunteered a reason for the objection: "It hurts; that is the ground." 2) Again referring to the co-indictees the prosecutor argued: "* * * And I want to tell you he had the right, and under the law it was his duty, connected with these people as he is, under the law it was his duty to bring those people here, under the summons and power of the court if they wouldn't come, and put them on the stand * * *." 3) Further argument was made as follows. "* * * There is not a word of testimony given here except over the objection of these defendants.

Have they come in here in the attitude of gentlemen who are willing to lay their cards on the table and say to the gentlemen of the jury, 'We want you to see these transactions and scrutinize them in detail; we are willing to show everything we have done in this bank and let you be the judge of whether we are guilty or not?' No; but they try to exclude every piece of testimony bearing upon the guilt of this defendant."

■■ Defendant next contends that his trial counsel was incompetent and that therefore he was denied effective assistance of counsel. Where an accused is represented by counsel of his own choice as was defendant, he can establish the incompetence of counsel only by demonstrating that his representation of the accused was of such low calibre as to amount to no representation at all and to reduce the trial to a farce. (*People v. Washington,* 1968, 41 Ill.2d 16, 241 N.E.2d 425.) In his attempt to meet this burden defendant makes several references to the record each of which, it is argued, establishes trial counsel's incompetence.

■■ We do not deem it necessary to discuss each of these references in detail. When studied within the context of the entire record, each fall into one of the following two categories: (a) there is no substance in law or basis in the record from which it may be inferred that counsel failed to fully protect defendant's interest, or (b) the alleged error or omission was a sound exercise of legal discretion in the conduct of the trial which resulted in no identifiable prejudice to the defendant. Contrary to defendant's assertions, our review of the record indicates that trial counsel consistently provided him with representation of a quality far in excess of the minimum necessary to pass as competent under the *Washington* decision.

■■ Defendant's contention that he was not proven guilty beyond a reasonable doubt is limited to his identification as the driver of the automobile. He argues at length with respect to a possible motive on the part of Hector Collazo and William Vasquez to testify falsely against him and also places great weight on the action of Ramon Vasquez in admitting to having been the driver of the auto.

The fact that the other three occupants of the car were related does, as defendant points out, raise the possibility of false testimony against him motivated by familial loyalty. This possibility, however, was merely a matter to be considered by the jury in determining the credibility of these witnesses. The same holds true with respect to the inconsistency between the fact of Ramon Vasquez's admissions made in the police station on the evening of the occurrence and his testimony implicating the defendant. He offered an explanation of the admission and it was the province of the jury to determine which of his statements, if either, constituted the truth.

Defendant's argument also ignores three substantial items of circumstantial evidence. The first is his wife's ownership of the car involved. Second is the testimony of Officer Tom Kelley with respect to the finding of a shoe wedged between the floor pedals of the car and his arrest of the defendant who was wearing only one shoe, the apparent mate to that found in the car. Defendant's explanation of the loss of his shoes, that the impact of the car striking other autos caused him to be thrown from the auto and that he lost the shoes when so thrown is not only contrary to the arresting officer's testimony with regard to defendant's footwear at the time of the arrest, but also suffers from defendant's further testimony that in spite of being so thrown from the vehicle he was not injured in any manner. Third is the evidence presented tending to establish defendant's consciousness of guilt by attempting to secrete himself within the community for two years following the occurrence by the use of false identities. In sum, this evidence presented was sufficient to support the verdict.

██ Defendant finally contends that the record affirmatively establishes that the trial court improperly considered his arrest record in determining sentence. A fair reading of the comments of the trial judge does not bear out defendant's contention. The court clearly indicated those matters offered in aggravation which he would consider in determining sentence. No such indication was made with reference to the information offered by the State which related to arrests only.

The judgment of the Circuit Court is affirmed.

Judgment affirmed.

BURKE, P. J., and GOLDBERG, J., concur.