THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LEMONT LAKE, Defendant-Appellant.

First District (2nd Division)   No. 1—96—3749

Opinion filed June 16, 1998.—Rehearing denied August 12, 1998—Modified opinion filed August 18, 1998.

Michael J. Pelletier and Barbara C. Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Clare Wesolik Connolly, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

Defendant Lemont Lake and codefendants Jermail Lake, Allen Duncan and Tineshea Lake were charged by indictment with two counts of first degree murder in the shooting death of Alvin Gilmore. After a jury trial, Lemont was found guilty and sentenced to 45 years' imprisonment.

On appeal Lemont contends that: (1) he was denied effective assistance of counsel because his attorney failed to submit an instruction defining the term "recklessness" along with the instructions for involuntary manslaughter to the jury and submitted the incorrect version of Illinois Pattern Jury Instructions, Criminal, No. 26.01Q (2d ed. Supp. 1989); (2) reversible error occurred because the trial court failed to excuse a prospective juror who had a pending lawsuit; and (3) the trial court abused its discretion in sentencing him to 45 years' imprisonment for first degree murder because the court considered in aggravation the fact that death occurred, which is inherent in the offense.

## BACKGROUND

Events that began with a street encounter between two women and a slap ended on December 26, 1992, with a hail of bullets being fired at and into a building with the resultant death of Alvin Gilmore, who suffered a gunshot wound to the head.

On December 26, 1992, Lashundia Davis, while on her way to a store by her home, ran into Tineshea Lake, who was with two other women, Rashawn Jackson and Kimberly Manning. Tineshea had previously dated Lashundia's boyfriend, Orlando Potts. Rashawn approached Lashundia, said something to her and slapped her across the face. At this point, Tineshea said "let's get her." Lashundia then ran home and spoke to her sister and brother, who then accompanied her to Tineshea's home. At Tineshea's house, Lashundia offered to fight Tineshea but Tineshea refused and Lashundia went home. On her way home, Lashundia ran into her mother and her boyfriend, Orlando Potts. After they conversed, Orlando Potts went to Tineshea's house and broke windows in her house.

Ben Harden testified for the State pursuant to a plea agreement in which first degree murder charges against him were dropped and he received a sentence of 12 years' imprisonment for aggravated discharge of a firearm. According to Harden's testimony, he was in a car with Lemont Lake when Lemont stopped to make a phone call in response to a page he received on his pager. Harden testified that defendant appeared to be angry when he got back in the car and told Harden that "[t]hey was bogus." Defendant then drove to Allen Duncan's apartment on 55th and Union Streets. Once inside, defendant told Allen to "give me that," at which point Allen retrieved a black, 9 millimeter gun along with a loaded clip and handed it to defendant. Defendant put the loaded clip into the gun.

Defendant, Ben Harden and Allen Duncan left Allen's apartment where, soon thereafter, they saw Jermail Lake and Shon Scott. Defen-

dant told Jermail and Shon, "They was bogus for doing that." Defendant, Allen Duncan and Ben Harden then drove to the Lake house at 39th and Prairie, where they met Jermail Lake and Shon Scott, who had driven separately. Rashawn Jackson was sweeping up the glass from the window that Orlando Potts had broken. Harden further testified that Tineshea told defendant that Orlando had broken the windows because she had called him "out [sic] his name." Harden also testified that Tineshea told the group, which consisted of himself, defendant, Jermail Lake, Shon Scott, and Allen Duncan, that they should go to Orlando's house and "kick his ass," but that they should be careful because someone would be there. Defendant then pulled out the 9 millimeter gun and said, "don't worry about it."

Defendant, Jermail Lake, Ben Harden, Shon Scott and Allen Duncan left the apartment and walked northbound on Prairie to Lashundia's house. Lashundia lived at 3932 S. Prairie, which is a low-rise housing unit. When they reached a tree about 30 feet away from Orlando's apartment, defendant told the group to stop, pulled the gun out of his jacket and aimed it toward the apartment. As defendant fired the gun he said, "watch me light this place up." He fired 16 shots at the apartment. On cross-examination, Harden testified that he could see people in Orlando's apartment before defendant began shooting.

Defendant, Ben Harden and Allen Duncan ran to defendant's car and Allen drove them to defendant's house, where they drank and watched videos. Jermail Lake and Shon Scott arrived 5 to 10 minutes later. Jermail then made a phone call in which Ben heard him say, "Is everybody straight? Is she O.K.?" Approximately 15 minutes later, the police arrived and arrested everyone.

At trial, Lashundia Davis testified that, at about 6:30 p.m., shortly after Orlando had gone to Tineshea's home to break her windows, she was at home with her mother, siblings, Eric Watkins and her nieces and nephews, including Alvin Gilmore. Eric Watkins looked out the window and said something that caused Lashundia to look out the window. When Lashundia looked out the window she saw defendant, Rashawn Jackson, Kimberly Manning, Tineshea, Jermail Lake and Allen Duncan approaching her apartment from the courtyard directly across from her apartment. Lashundia claimed that the group was within 40 feet of her apartment at one time prior to shooting. Prior to the shooting, 14-year-old Alvin Gilmore was sitting at the kitchen table near a window. Testimony established that he died from a gunshot wound to his brain.

At the conclusion of simultaneous bench and jury trials, the trial court found all of the defendants guilty of first degree murder. Defendant was sentenced to 45 years' imprisonment. He now appeals.

We affirm.

ANALYSIS

I

Defendant contends that he was denied effective assistance of counsel because his trial counsel failed to tender a jury instruction defining "recklessness" and because trial counsel failed to tender the correct version of IPI Criminal 2d No. 26.01Q (Supp. 1989).

■ In order to prevail on a claim of ineffective assistance of counsel, a defendant must establish that: (1) the defense counsel's performance deviated from an objective standard of reasonableness; and (2) the defendant was substantially prejudiced by the alleged errors such that the verdict would be different. *People v. Albanese*, 104 Ill. 2d 504, 526-27, 473 N.E.2d 1246 (1984), adopting *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). A court need not determine the performance prong of this *Strickland* test before analyzing whether defendant has suffered any prejudice. *People v. Gaines*, 105 Ill. 2d 79, 92-93, 473 N.E.2d 868 (1984). In the instant case, we do not believe defendant was prejudiced by his counsel's errors.

■ Intentionally firing a weapon at an occupied building is an act that has a natural tendency to cause death or great bodily harm and is of such a character as to defeat any assertion of recklessness. *People v. Washington*, 257 Ill. App. 3d 26, 35, 628 N.E.2d 351 (1993), citing *People v. Cannon*, 176 Ill. App. 3d 49, 530 N.E.2d 1035 (1988). Here, the jury did not find and could not have found defendant guilty of involuntary manslaughter because the evidence indicated that he fired a barrage of bullets at Lashundia's home, which was an occupied building. Defendant's conduct had the natural tendency to cause death or great bodily harm and was of such a character as to defeat any assertion of recklessness, the key element of involuntary manslaughter. *People v. Washington*, 257 Ill. App. 3d at 35.

At trial, defense counsel tendered Illinois Pattern Jury Instructions, Criminal, No. 7.07 (2d ed. 1981) (hereinafter IPI Criminal 2d), which is the definitional instruction on involuntary manslaughter and provides as follows:

"A person commits the offense of involuntary manslaughter when he intentionally causes the death of an individual by acts which are performed recklessly and are likely to cause death or great bodily harm to another."

The committee note following the instruction states that IPI Criminal 2d No. 5.01, defining "recklessness," is to be given with IPI Criminal 2d No. 7.07.

Defendant cites *People v. Howard*, 232 Ill. App. 3d 386, 597 N.E.2d 703 (1992) (Cerda, J., dissenting), to support his argument that failure to tender the definition of "recklessness" requires reversal. In *Howard*, the defendant's conviction for murder was reversed because the defendant's trial counsel failed to tender an instruction defining "recklessness," an element of involuntary manslaughter, and referred to involuntary manslaughter as a "cop-out" if the jury was to return such a verdict. *Howard*, 232 Ill. App. 3d at 392-93. This court concluded that the evidence presented against the defendant was closely balanced as there was only one witness to the stabbing that occurred between the defendant and his best friend and the stabbing appeared to be accidental. *Howard*, 232 Ill. App. 3d at 392.

*Howard* is distinguishable because the evidence in the instant case was not closely balanced, whereas, in *Howard*, the evidence was closely balanced and did not overwhelmingly support a verdict of murder (*Howard*, 232 Ill. App. 3d at 392). See *People v. Washington*, 257 Ill. App. 3d at 35 ("Defendant's trial testimony that he was aiming at the house when he fired the shotgun and did not intend to kill anyone does not create a jury question on the issue of recklessness. In fact, it negates it").

Moreover, the majority of Illinois courts have failed to mandate reversal in this situation. See *People v. Maldonado*, 3 Ill. App. 3d 216, 278 N.E.2d 225 (1971) (failure of court to define "reckless" was not prejudicial); *People v. Brown*, 9 Ill. App. 3d 730, 293 N.E.2d 1 (1973) (no error was caused by failure to instruct the jury on definition of "recklessness" because defendant was not substantially prejudiced); *People v. Hairston*, 39 Ill. App. 3d 747, 250 N.E.2d 497 (1976) (omission of definition of the term "recklessness" did not constitute prejudicial error); *People v. Carlson*, 79 Ill. 2d 564, 404 N.E.2d 233 (1980) (failure to give jury an instruction defining "recklessly" was not a substantial defect and the failure of the defendant to tender the correct instruction waived his right to complain on appeal). Accordingly, we conclude that counsel's omission of the definition of "recklessness" did not constitute reversible error.

■ We also believe that counsel's tender of the incorrect version of IPI Criminal 2d No. 26.01Q (Supp. 1989) was harmless error. Defendant complains specifically of the last paragraph of this instruction, which informed the jury that, if it found that the State had proven defendant guilty of both first degree murder and involuntary manslaughter, it should sign only the verdict form finding defendant guilty of first degree murder. This instruction is incorrect because a jury cannot properly find the offenses of murder and involuntary manslaughter to exist simultaneously. *People v. Basden*, 264 Ill. App. 3d 530, 543-45,

636 N.E.2d 919 (1994); *People v. Summers*, 202 Ill. App. 3d 1, 559 N.E.2d 1133 (1990); *People v. Rodriguez*, 275 Ill. App. 3d 274, 287, 655 N.E.2d 1022 (1995). In the third edition for the pattern criminal instructions, the Illinois Supreme Court Committee on Pattern Jury Instructions attempted to remedy this problem by noting that the last paragraph of the instruction should not be given when the lesser offense has the less culpable mental state of recklessness. Illinois Pattern Jury Instructions, Criminal, No. 26.01Q, Committee Note, at 386-87 (3d ed. 1992).

As we have discussed above, the evidence in this case proved defendant guilty of first degree murder. Furthermore, we note, as was noted in *People v. Summers*, 202 Ill. App. 3d at 16, there is no indication that the jury ever found that the State had proven defendant guilty of both first degree murder and involuntary manslaughter. In fact, during deliberations, the jury sent a note to the court requesting guidance on the elements of first degree murder. The note provided:

> "In the definition of First Degree Murder, is it necessary that his intent to kill or do great bodily harm had to be directed against Alvin specifically or just to anybody in the house."

Thus, even though the submission of IPI Criminal 2d No. 26.01Q (Supp. 1989) was error, this error did not prejudice defendant and, therefore, does not require reversal. See *People v. Towns*, 157 Ill. 2d 90, 108-09, 623 N.E.2d 269 (1993); *People v. Tucker*, 245 Ill. App. 3d 722, 614 N.E.2d 1265 (1993); *People v. Rodriguez*, 275 Ill. App. 3d 274, 287-88, 655 N.E.2d 1022 (1995). In view of our holding, we deem it unnecessary to address the State's waiver argument on this issue.

## II

Lemont next contends that reversible error occurred where the trial court failed to excuse a prospective juror who had a pending lawsuit but served on the jury.

Under section 14 of the Jury Act, a prospective juror who is a party to a suit pending for trial in that court is not qualified to sit as a juror and must be removed for cause. 705 ILCS 305/14 (West 1992). The trial court does not have the discretion to allow a prospective juror to sit when that juror is subject to statutory disqualification. *People v. Gonzalez*, 238 Ill. App. 3d 303, 323, 606 N.E.2d 304 (1992). However, a court's failure to remove a venireperson for cause is grounds for reversal only if the defense exercised all of its peremptory challenges and an objectionable juror was allowed to sit on the jury. *People v. Suter*, 292 Ill. App. 3d 358, 370, 685 N.E.2d 1023 (1997); *People v. Pendleton*, 279 Ill. App. 3d 669, 675, 665 N.E.2d 350 (1996).

■ Lemont has waived review of this issue because he failed to

include this issue in his posttrial motion (see *People v. Enoch*, 122 Ill. 2d 176, 186-87, 522 N.E.2d 1124 (1988)). However, even if this issue was not waived, we believe Lemont's argument is meritless.

Defendant has set forth the pertinent testimony in his brief. During *voir dire*, the following colloquy occurred with juror Melodie Karnezis:

"Q. And you have been a party to a lawsuit?

A. Yes.

Q. Is that presently pending in the Circuit Court of Cook County?

A. Well, there is a personal injury one that I wasn't really thinking about when I checked that. Some lady broadsided me recently. I guess you would call that ...

Q. Are you a named party in that?

A. No, I don't think so. It's a personal injury case that she smashed into my car. I suppose both our names are on it.

Q. Are the insurance companies on it?

A. I do have a lawyer so I guess because both our names are on it. I answered that question correctly."

In our view, the testimony that is quoted in the brief does not clearly indicate that juror Karnezis was a party to a pending suit at the time of the trial in the instant case. Therefore, we cannot say that the trial court erred in refusing to remove her for cause.

## III

■ Lemont finally contends that the trial court abused its discretion in sentencing him to 45 years' imprisonment for first degree murder because the court considered in aggravation the fact that death occurred, a factor that is inherent in the offense of first degree murder. Lemont points to the court's comments at the sentencing hearing that Lemont had directly caused Alvin Gilmore's death and that what had occurred was a "tragedy" and a "severe and violent crime." Lemont also notes that the only other factor that the court noted in aggravation was the fact that Lemont had purchased a weapon while the case was pending against him. Lemont has waived this issue because he failed to include it in his postsentencing motion. 730 ILCS 5/5—8—1(c) (West Supp. 1995). Regardless, we believe that Lemont's argument is unpersuasive.

Generally, it is improper to consider factors implicit in the offense as aggravating factors. *People v. Kargol*, 219 Ill. App. 3d 66, 73, 578 N.E.2d 1356 (1991). Thus, it is improper for a court imposing a sentence to rely upon the end result of the defendant's conduct, *i.e.*, the death of the victim, if that factor is implicit in the offense itself. See *People v. Saldivar*, 113 Ill. 2d 256, 269, 497 N.E.2d 1138 (1986) (victim's death could not be considered as aggravating factor in convic-

tion for voluntary manslaughter). It is not impermissible for the sentencing court to consider the force employed and the physical manner in which the victim's death was brought about. *Saldivar*, 113 Ill. 2d at 270.

In the instant case, there is no indication in the record that the trial court improperly relied upon the victim's death as an aggravating factor warranting an extended-term sentence. Rather, the record suggests that the trial court's statements were general passing comments on the defendant's actions and the consequences of those actions. See *People v. Beals*, 162 Ill. 2d 497, 509, 643 N.E.2d 789 (1994). Accordingly, defendant's conviction and sentence are affirmed.

For the reasons cited herein, the judgments of the circuit court of Cook County are affirmed. As part of our judgment, we grant the State's request and assess defendant $150 as costs for this appeal.

Affirmed.

McNULTY, P.J, and TULLY, J., concur.