NOTICE

Decision filed 06/04/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230014-U

NO. 5-23-0014

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 20-CF-1476 |
| | ) | |
| LAMAR T. WILLIAMS, | ) | Honorable |
| | ) | Thomas E. Griffith, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the defendant's conviction where the State presented sufficient evidence of intent for the trial court to find the defendant guilty of first degree murder beyond a reasonable doubt.

¶ 2    The defendant, Lamar T. Williams, was convicted after a bench trial of first degree murder for shooting and killing Mary Bond and for being an armed habitual criminal. On appeal, the defendant argues that the State failed to prove he was guilty beyond a reasonable doubt of first degree murder where it did not present sufficient evidence of intent and requests this court reduce his conviction to involuntary manslaughter. For the following reasons, we affirm the defendant's conviction.

1

¶ 3                              I. BACKGROUND

¶ 4      This case stems from three indictments which were joined for trial: 20-CF-1472, 20-CF-1473, and 20-CF-1476. Each case related to a shooting incident occurring on November 24, 2020, in separate locations in Decatur, Illinois. In the matter on appeal (20-CF-1476), the defendant was charged by information on November 30, 2020, with three counts of first degree murder for shooting and killing Bond. One count was charged in violation of section 9-1(a)(2) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a)(2) (West 2020)) and two counts were charged in violation of section 9-1(a)(1) of the Code (*id.* § 9-1(a)(1)). The defendant was additionally charged with one count of armed habitual criminal in violation of section 24-1.7(a) of the Code (*id.* § 24-1.7(a)), one count of aggravated discharge of a firearm in violation of section 24-1.2(a)(1) of the Code (*id.* § 24-1.7(a)), and two counts of unlawful possession of a controlled substance in violation of section 401(c)(2) of the Illinois Controlled Substances Act (720 ILCS 570/401(c)(2) (West 2020)). Prior to trial, the State dismissed the two counts of unlawful possession of a controlled substance.

¶ 5                              A. Bench Trial

¶ 6      The defendant was arrested on November 25, 2020. He later waived a jury trial and his bench trial commenced on October 3, 2022. The trial court heard evidence that the events in question occurred between November 22, 2020, through November 24, 2020, and stemmed from a dispute between Bond's granddaughter, Ashlina Cook, and the defendant. The dispute culminated in multiple shootings in different locations which resulted in injury and death. Each shooting was located at a residence occupied by a family member of Ashlina Cook. The trial took place over a three-day period, with 23 witnesses testifying. As the defendant's contentions on appeal center on the sufficiency of the evidence for the element of intent required for first degree

murder, we will limit our factual recitation to relevant testimony related to the defendant's contentions on appeal.

¶ 7                                    1. Testimony of Ashlina Cook

¶ 8    Ashlina Cook testified to her family relationships, including: (1) Mary Bond, her grandmother; (2) Pearl Burries, her mother; (3) Tiara Enoch, her sister; (4) Marvin Dunning, her son's father; and (5) Vergel Burries, her cousin. Cook testified that in November of 2020, she had been in a dating relationship with the defendant for approximately six years. The two had been living together in a house in Decatur for over a year.

¶ 9    In November of 2020, Cook received approximately $20,000 and had discussed the money with the defendant. Cook gave the defendant about $1500 that she intended to use to buy a truck. She explained that she asked the defendant to hold the money to keep it safe because she was not good with money.

¶ 10    On November 21, at around 1 a.m., Cook and the defendant began to argue at their home. Cook asked the defendant to return her $1500 along with her car keys. The defendant had borrowed Cook's car earlier in the evening. The defendant returned Cook's keys but did not give her any money and left the residence.

¶ 11    The next morning, on November 22, Cook began to develop a plan to leverage her money back from the defendant. Cook testified that she took a pair of clippers that the defendant used to cut hair as a barber, hid the clippers in the house, and then went to her car. In her car, Cook found a mostly empty bottle of Hennessy, a small bag of weed, and a small bag of crack, along with a gun. Cook decided at that point that she could hold on to the gun in order to get her money back from the defendant. Cook took the gun to her cousin Vergel's home and told him to hold it stating that she would return to retrieve the gun in the morning. The defendant communicated with Cook

3

about getting his gun back, and after first pretending not to know about a gun, Cook told the defendant, "Well, if you produce my $1,500, I can probably remember, you know, something about a gun."

¶ 12    Cook testified that she was concerned for her safety based on the continuing argument with the defendant and decided not to go home that night, ending up sleeping in her vehicle in a church parking lot. When she awoke the next morning, November 23, she discovered messages on her cellular phone from the defendant that she had not read and testified that the messages were "getting scary." After reading more messages from the defendant, Cook decided to go back to Vergel's house to get the gun. Vergel told her that Cook's cousin, Taylor Boyd, had stolen the gun. At that point, after being unable to locate Boyd, Cook contacted the Decatur Police Department and reported the gun stolen. During the day, Cook showered at the homeless shelter, Oasis, obtained food and cigarettes at the gas station, and went to her grandmother's house to tell her that she did not feel safe. For most of the day, Cook stayed in her vehicle in the church parking lot.

¶ 13    All through the day on November 23, Cook continuously received text and voice messages from the defendant and phone calls from numbers she did not recognize. She received voice messages from the defendant, which she recognized from his phone number, and she was able to identify his voice in messages from other unknown numbers. Additionally, Cook received video messages through a phone application called Duo. Cook testified that the messages were coming in practically nonstop.

¶ 14    On November 24, Cook obtained an order of protection. After receiving the order, she again showered at the Oasis, and obtained supplies to return to the church parking lot. Some of the messages that Cook received from November 22 to 24, from the defendant, included photographs of her family members' houses and apartments, including the home where her child lived. Cook

4

testified that the defendant was familiar with where her family members lived, having been in a relationship for six years.

¶ 15   The State later offered recordings and transcripts of the defendant's messages as exhibits which were admitted without objection. The transcripts showed that the defendant was threatening to harm or kill himself if Cook did not respond or engage with the defendant, including a photograph of the defendant holding an electrical cord next to a bathtub. Some of the additional messages included: "U will regret it"; "I win not U"; "not playing with U at all"; "be scared"; "side of me you was warned about"; and "run."

¶ 16   At about 10:15 p.m. that evening, Cook received a phone call from her uncle telling her that her grandmother, Mary Bond, had been shot. While Cook was panicking, and on her way to her grandmother's house, she received a phone call from an unknown number. Cook picked up and recognized the defendant's voice. Cook's recollection was foggy, but she testified that the defendant said something like, "See what I did now" or "Watch what I'm going to do now," or "See what happened at your grandma's house."

¶ 17   Once Cook arrived at her grandmother's house, she received another call from a private phone number that she did not recognize. Again, she recognized the defendant's voice upon answering. Cook attempted to hand the phone to a police officer on scene but could not get his attention. Cook went to speak with an investigator at the police department and gave the police permission to search her phone. She also aided the investigator in identifying the defendant as the contacting party in the various messages and calls the defendant received leading up to Bond's death.

¶ 18                                    2. Messages and Phone Data

¶ 19    The State presented Detective Adam Siefman to testify about Cook's phone and the messages Cook received from the defendant. The detective testified that Cook came into the police station to show the messages from the defendant as part of the investigation of the shooting. Cook gave the officer her cellular phone, and the detective took a video recording of him scrolling through the text thread of messages between Cook and the defendant. The video and messages were stored on a DVD, as well as transcripts of the text and audio messages. The DVD and transcripts were admitted into evidence without objection.

¶ 20    The State also called David Dailey. Dailey testified that he was a police officer involved in the case and that he was certified in cell phone data extraction from a company called "Cellebrite." Dailey stated that Detective Siefman had asked Dailey to extract the data from Cook's phone, as she had given Detective Siefman permission to do so. Dailey testified that he extracted text messages, as well as audio and video clips from the TextNow and Duo apps. Dailey stated that he stored the audio messages and confirmed the accuracy of a prepared transcription of the messages. The data reports, DVDs, and transcripts of the messages were admitted into evidence without objection.

¶ 21    Officer Timothy Wittmer next testified that, after he arrested the defendant on November 25, 2020, he took possession of the defendant's cell phone. Detective Jason Kuchelmeister testified to the process and accuracy of the data obtained from the defendant's phone that was provided to the investigation from Google. The data provided information about pictures taken by the defendant, including the time and location of the photographs. Most of these pictures, including pictures of family members' homes, had been sent to Cook's phone. The data and reports were admitted into evidence without objection.

¶ 22                                3. Timeline of Events

¶ 23    The defendant sent Cook a voice message at 8:29 p.m. on Tuesday, November 24, 2020, that said, "You gonna call me in a minute. Those you love the most, watch this." Officer Charles Lane testified that at 8:53 p.m. on the same day, he was dispatched to an address on Webster Street due to a report of shots fired in the area. The victim, Billy Singleton, testified that he was with Taylor Boyd, Cook's cousin, at her family's home watching television. He heard a knock at the door, then a gunshot was fired through the door and into the home.

¶ 24    Officer Ryan Wicks testified that at about 9:30 p.m. on November 24, 2020, he was dispatched to an address on Whitmer Street in response to a call of shots fired in the area. He also received a notice from an alarm company that there was a call for help from an address on East Moore, which was one block away from the Whitmer location. A little boy had stated that his grandmother had been shot in the head. When the officers entered the residence, they saw the victim, Cook's grandmother Mary Bond, slouched over on the couch, with a baby next to her. Two young boys were also in the home. Bond was unresponsive, bleeding significantly from her head, and gasping for air. Bond later died in the hospital before 11:10 p.m. Data retrieved from the defendant's phone demonstrated that the defendant took a photograph near East Moore and South 16th Street, near Bond's home, around 8:56 p.m. that evening. The police investigation later revealed the defendant shot at the home seven times from the roadway in front of it.

¶ 25    Around 9:44 p.m. that same evening, officers were called to the home of Marvin Dunning, the father of Cook's child, due to reports of shots fired. Surveillance footage showed a man behind the apartment building firing multiple gunshots in the air. Cook later identified the man to be the defendant.

¶ 26    Around 10 p.m. on November 24, Cook received a phone call from her uncle, letting her know that Bond had been shot. On her drive to Bond's home, Cook received a call from an unknown number but recognized the voice to be that of the defendant. Cook did not recall the phone call verbatim but testified that the defendant said something similar to "Watch what I'm going to do now."

¶ 27    The defendant sent additional voice messages after the shootings in the early morning of November 25. The message at 2:02 a.m. said, "I heard someone shot ya'lls your shit up tonight. Hey, that's a preview of what's to come. Keep playing with me. Shit gonna get real personal. Call me bitch! Kids and all." The message at 2:13 a.m. said, "I heard somebody, ironically, shot your grand momma's house up, and other shit. Ain't that some shit. Now why would somebody do that shit. Shoot your grand mommas house up and shit. That's some bitch ass shit. Whoever did that, should get a medal. Now why would someone do that." The message at 2:30 a.m. said, "I told you, I told you what shit was gonna be like. I told you."

¶ 28    Upon completion of the bench trial, the trial court found the defendant guilty beyond a reasonable doubt of first degree murder under section 9-1(a)(2) of the Code (720 ILCS 5/9-1(a)(2) (West 2020)), in that he knowingly performed acts that he knew created a strong probability of death or great bodily harm to Mary Bond or another, as well as armed habitual criminal pursuant to section 24-1.7(a) of the Code. The defendant was sentenced to 55 years' incarceration for first degree murder, consecutive to 10 years' incarceration for armed habitual criminal, to be served at 85% with a 3-year term of mandatory supervised release. The defendant was found not guilty in cases 20-CF-1472 and 20-CF-1473, involving the shootings at Cook's other family members' homes. The defendant's motion to reconsider sentence was denied on December 21, 2022. The defendant filed this timely appeal.

8

II. ANALYSIS

¶ 30 On appeal, the defendant contends that the State failed to prove him guilty of first degree murder beyond a reasonable doubt. The defendant does not contest on appeal that he was the individual that discharged a firearm into Bond's home, but argues that the State failed to prove that when he shot a firearm into Bond's house, he knew that such an act created a strong probability of death or great bodily harm to Bond or another. Thus, the defendant argues that the evidence presented by the State was not sufficient to establish guilt beyond a reasonable doubt for first degree murder, and that his conviction should be reduced to involuntary manslaughter under section 9-3(a) of the Code (*id.* § 9-3(a)).

¶ 31 The State argues that the trial court determined that the defendant was proved guilty beyond a reasonable doubt due to his actions creating a strong probability of death or great bodily harm, and that his actions were done knowingly. The State cites the facts that the defendant acted in an increasing rage over the course of three days, sending threatening messages to Cook, and eventually firing into Bond's home seven times, resulting in Bond's death, as circumstantial evidence of the defendant's mental state.

¶ 32 A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). When presented with a challenge to the sufficiency of the evidence, the relevant question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt after viewing the evidence in the light most favorable to the prosecution. *People v. Mimms*, 312 Ill. App. 3d 226, 228 (2000) (citing *Collins*, 106 Ill. 2d at 261). This standard applies regardless of whether the evidence is direct or circumstantial, and circumstantial evidence meeting this standard is sufficient to sustain a criminal

conviction. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). The determination of the credibility of each witness, the weight to be given to his or her testimony, and the resolution of any conflicts in the evidence is within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 132 (1999). Upon review, the court must allow all reasonable inferences from the record in favor of the prosecution. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004) "An inference is a factual conclusion that can rationally be drawn by considering other facts." *People v. Funches*, 212 Ill. 2d 334, 340 (2004). A fact finder may draw an inference in its discretion but is not required to do so as a matter of law. *Id.* However, "if only one conclusion may reasonably be drawn from the record, a reviewing court must draw it even if it favors the defendant." *Cunningham*, 212 Ill. 2d at 280.

¶ 33 Here, the State charged the defendant with first degree murder (720 ILCS 5/9-1(a)(2) (West 2020)), alleging that the defendant, without lawful justification, shot Mary Bond in the head, while knowing his act created a strong probability of death or great bodily harm. For first degree murder, the State was required to prove (1) the defendant performed the act which caused the death of Bond and, (2) when he did so, he knew that his act created a strong probability of death or great bodily harm to Bond or another. *Id.*

¶ 34 To sustain a conviction for knowing first degree murder, the State is not required to prove that the defendant had the specific intent to kill or do great bodily harm, or that he knew with certainty that someone would die as a result of his acts. *People v. Howery*, 178 Ill. 2d 1, 42 (1997).

"A person who knows, *i.e.*, is consciously aware, that his acts create a strong probability of death to another may not have such death as his conscious objective or purpose. [Citation.] He may simply not care whether the victim lives or dies. Under these

10

circumstances, the person would be guilty of murder although the death was caused 'unintentionally.' " *People v. Deacon*, 130 Ill. App. 3d 280, 287-88 (1985).

¶ 35 A defendant commits murder when the defendant's acts cause the death of the victim, and he "knows that such acts create a strong probability of death or great bodily harm to that individual." 720 ILCS 5/9-1(a)(2) (West 2020). To sustain a first degree murder conviction pursuant to section 9-1(a)(2), there must be evidence from which the trier of fact could infer that the defendant knew, at minimum, that his acts created a strong probability of great bodily harm to another individual, that the defendant acted, and that the act resulted in the death of another. *People v. Mifflin*, 120 Ill. App. 3d 1072, 1077 (1984).

¶ 36 A defendant commits involuntary manslaughter when he unintentionally kills an individual if the acts which cause the death "are likely to cause death or great bodily harm *** and he performs them recklessly." 720 ILCS 5/9-3(a) (West 2020). A person acts recklessly when he or she "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow *** and that disregard creates a gross deviation from the standard of care which a reasonable person would exercise in the situation." *Id.* § 4-6. Involuntary manslaughter is a lesser-included offense of first degree murder. *People v. Robinson*, 232 Ill. 2d 98, 105 (2008).

¶ 37 The distinguishing element between first degree murder and involuntary manslaughter is the mental state that accompanies the conduct resulting from the victim's death. *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998), *abrogated on other grounds by People v. McDonald*, 2016 IL 118882. As charged in this case, first degree murder requires knowledge whereas involuntary manslaughter requires recklessness. Compare 720 ILCS 5/9-1(a)(2) (West 2020) (knowing first degree murder) with 720 ILCS 5/9-3(a) (West 2020) (involuntary manslaughter). Whether a defendant acted knowingly may be inferred from the circumstances of the incident, the

defendant's conduct, and the nature and severity of the victim's injuries. *People v. Doolan*, 2016 IL App (1st) 141780, ¶ 51. Moreover, where, as here, a defendant denies his intent to commit the crime, the State may prove his mental state through circumstantial evidence. *People v. Steele*, 2014 IL App (1st) 121452, ¶ 23. The trier of fact is in the best position to determine whether a particular mental state is present. *People v. Pollard*, 2015 IL App (3d) 130467, ¶ 27.

¶ 38     While a defendant may act recklessly where he or she commits deliberate acts but disregards the risks of those acts, a voluntary and willful act that has the natural tendency to cause death or great bodily harm is evidence of an intentional act rather than a reckless act. *Doolan*, 2016 IL App (1st) 141780, ¶ 51. "Intent is a state of mind which, if not admitted, can be established by proof of surrounding circumstances, including the character of the assault, the use of a deadly weapon, and other matters from which an intent to kill may be inferred. [Citations.]" *People v. Winters*, 151 Ill. App. 3d 402, 405 (1986). In particular, when a defendant uses a deadly weapon upon a victim, it may be inferred the defendant intended to cause death. *People v. Koch*, 306 Ill. App. 3d 634, 637 (1999).

¶ 39     The defendant argues that he did not intend to cause death or bodily harm, and that his voice messages to Cook demonstrated that he was not aware that anyone in the home had been harmed. Specifically, the defendant said, "I heard somebody, ironically, shot your grand momma's house up, and other shit. Ain't that some shit. Now why would somebody do that shit. Shoot your grand mommas house up and shit. That's some bitch ass shit. Whoever did that, should get a medal. Now why would someone do that"; and "Damn, somebody shot your grand mommas house up? For real? That's some fucked up ass shit man." The defendant further argues that his lack of awareness of Bond's death in the voice messages proves he only intended to cause property

12

damage, and this supports his argument that he did not have the requisite mental state to be found guilty of first degree murder. We disagree.

¶ 40 Our courts have previously held intentionally firing a weapon at an occupied building is an act that has a natural tendency to cause death or great bodily harm, which defeats any assertion of recklessness. In *People v. Lake*, 298 Ill. App. 3d 50, 54 (1998), the defendant intentionally fired repeated shots at a home he knew to be occupied and the jury found him guilty of first degree murder. The appellate court held that the defendant's conduct of shooting multiple times into an occupied building had the natural tendency to cause death or great bodily harm and was of such a character as to defeat any assertion of recklessness. *Id.* In *Mimms*, 312 Ill. App. 3d at 228, the court found sufficient evidence to uphold a first degree murder conviction after the defendant fired his weapon at an occupied house, resulting in the victim dying from a gunshot wound to the head. Specifically, the court held that, "Defendant is presumed to know that his firing a gun at an occupied home 'create[d] a strong probability of death or great bodily harm' to the occupants of that home, which included the victim, Candace." *Id.* at 231 (citing 720 ILCS 5/9-1(a)(2) (West 1996)).

¶ 41 In his reply brief, the defendant argues that *Mimms* and *Lake* are distinguishable because there was direct evidence in those cases that the defendants knew that the building was occupied before the defendants shot towards the buildings, whereas the State in the present case presented no evidence that the defendant knew that Bond's house was occupied before the defendant began shooting at it.

¶ 42 We find *People v. Steppan*, 2012 IL App (4th) 090481-U, to be persuasive. In *Steppan*, the defendant fired numerous rounds into the second story of a home, resulting in a charge of attempted first degree murder. *Id.* ¶ 4. The defendant had previously left multiple threatening phone calls to

13

the victim earlier that day. *Id.* On appeal, the defendant argued that the State failed to prove his guilt of attempted murder beyond a reasonable doubt because the defendant did not know that there were people in the home and thus, the same mental state was lacking. *Id.* ¶ 53. This court disagreed with the defendant's argument, holding:

"While the defendant may not have been pointing the gun directly at a human target, the defendant's actions constituted a clear and conscious disregard of safety and the creation of a substantial risk of resulting death or great bodily harm. We find that the defendant's mental state and his actions on the evening of October 17, 2008, support the jury's conviction of attempted murder beyond a reasonable doubt." *Id.* ¶ 54.

¶ 43    The factors that the court considered included circumstantial evidence that indicated the home was occupied, including the late hour of the shooting; the room being illuminated by lamps; the victim's van parked in the driveway; the defendant's familiarity with the victim and the home; and the knowledge of the victim's children living in the home. *Id.*

¶ 44    Here, the defendant sent multiple threatening text and voice messages to Cook in the days leading up to the shooting. These threatening messages included pictures of family members' houses, threats of suicide if Cook did not respond, and threats of violence against Cook and her loved ones. Roughly an hour before Bond was shot, the defendant sent a voice message to Cook saying, "You gonna call me in a minute. Those you love the most, watch this." The shooting occurred on a Tuesday night around 9:30 p.m., a time when people are typically at home. Bond's vehicle was parked outside of the home, indicating that someone was likely present in the home. The defendant was familiar with Cook's family and their homes due to the defendant's relationship with Cook. Further, other shootings occurred at multiple homes of Cook's relatives the same evening and the defendant had sent threatening messages to Cook, which included photographs of

14

those houses. The defendant stood in the roadway in front of Bond's house and shot seven times. After the shootings, the defendant continued to send taunting and threatening messages to Cook about the shootings. One of these messages stated, "I told you, I told you what shit was gonna be like. I told you," which the trial court considered when discussing its guilty verdict.

¶ 45 The defendant argues that one of his voice messages shows he only intended to cause property damage to the home and is exculpatory of his mental state. The message starts by saying, "I heard somebody, ironically, shot your grand momma's house up." The message continues and the defendant states, "Whoever did that, should get a medal." Contrary to the defendant's argument, we do not find the voice message to negate the defendant's mental state surrounding the shooting. The defendant did not mention the death of Bond in the message, but his actual knowledge of her death was not necessary to prove that he acted knowingly in a manner that created a strong probability of death or great bodily harm.

¶ 46 The trial court was in the best position to determine the defendant's mental state, which may be inferred from his actions and the circumstances surrounding the offense. The circumstantial evidence here was sufficient for the trial court to find that the defendant had knowledge that the house was occupied and that his acts created a strong probability of death or great bodily harm to another. Thus, the trial court's finding of the mental state for first degree murder was not inherently impossible or unreasonable.

¶ 47 In viewing the facts most favorable to the prosecution, the evidence was sufficient for a rational trier of fact to find the defendant was guilty of first degree murder. The defendant acted knowingly in a manner that created a strong probability of death or great bodily harm by shooting into an occupied home seven times. Accordingly, the evidence was sufficient to convict the defendant of first degree murder pursuant to section 9-1(a)(2) of the Code. While Illinois Supreme

Court Rule 615(b)(3) (eff. Jan. 1, 1967) provides that a reviewing court may reduce the degree of offense for which the appellant was convicted, where, as here, the evidence was sufficient to prove the defendant guilty of the offense charged beyond a reasonable doubt, we are not presented with a circumstance under which a reduction of the defendant's conviction is warranted.

¶ 48                                  III. CONCLUSION

¶ 49    For the reasons stated, we affirm the defendant's conviction of first degree murder.

¶ 50    Affirmed.